**DELTA ENERGY RESOURCES, INC.**

v.

**DAMSON OIL CORPORATION.**

Civ. A. No. 85–1149.

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Dec. 4, 1985.

Philip K. Jones, Jr., Liskow & Lewis, New Orleans, La., for Damson Oil Corp.

Harry R. Holladay, Chaffe, McCall, Phillips, Toler and Sarpy, New Orleans, La., for The Unsecured Creditors Committee of Delta Energy Resources, Inc.

William C. Sandoz, Opelousas, La., for Charles N. Wooten, Sr., Trustee for the Bankruptcy Estate of Delta Energy Resources, Inc.

## STATEMENT OF JURISDICTION

EDWIN F. HUNTER, Jr., Senior District Judge.

This case arises under Title 11 of the United States Code (*i.e.*, the United States Bankruptcy Code) and jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1334. Furthermore, this matter constitutes a "core proceeding" pursuant to 28 U.S.C. § 157(b). As such the judgment of the Bankruptcy Court in this proceeding is subject to review by this Court pursuant to 28 U.S.C. § 158(a).

This litigation began with the rejection by William C. Sandoz, the prior trustee, of the "purchase and sale agreement" dated September 29, 1983, entered into between Damson Oil Corporation (Damson) and Delta Energy Resources, Inc. (Delta). According to the terms of that agreement *Delta was to convey to Damson its leasehold interest, less and except a 1/32 overriding royalty* retained by Delta, in and to certain mineral properties located in the "East Moss Lake Field". A hearing was held on March 5, 1984, regarding the trustee's proposed rejection. The Bankruptcy Judge determined that although Damson had paid $1,000,000.00 toward a purchase price of approximately $5,000,000.00 and had taken, or had attempted to take, certain other steps toward fulfillment of its end of the bargain, the contract nevertheless remained executory as of the date the bankruptcy case was filed. Despite Damson's contentions to the contrary, the court agreed with the trustee and found that the rejection of the contract would be in the

best interest of the estate. The rejection order contained provisions intended to insure that Damson would eventually recover the $1,000,000.00 it had paid toward the purchase price, specifically Damson was to be granted a lien in the amount of $1,000,000.00 against Delta's interest to the property which formed the subject of the rejected contract. 11 U.S.C. § 365(j). Then, too, as an additional measure of security, or assurance to Damson the order granted *it an administrative priority* pursuant to 11 U.S.C. § 364(d) for any deficiency which might result should the 365(j) lien prove ultimately inadequate.

The submission of the proposed judgment was delayed by negotiations between the parties concerning a possible settlement, and a judgment was not entered by the Bankruptcy Court until August 24, 1984. The Trustee thereafter moved for reconsideration of the judgment based upon the priority given Damson's claim vis-a-vis administrative expenses of the Estate. At that time the Trustee did not object to the lien given to Damson pursuant to section 365(j). However, the Unsecured Creditors' Committee filed a motion to reconsider alleging that the judgment was incorrect and that Damson was not entitled to a lien to secure recovery of its claim resulting from the rejection. Both motions were heard on September 27, 1984. Following the hearing and additionaL BRIEFING, THE Bankruptcy Court withdrew its original judgment and issued Findings and Conclusions on January 3, 1985.[1] A judgment in accordance with the Findings and Conclusions was entered on February 17, 1985, which modified the order of August 24, 1984, by granting

> to Damson an entitlement to damages resulting from the rejection/breach, including but not limited to its $1,000,000.00 claim as an *unsecured* creditor of the estate.

This appeal followed.

### *Secured Status and Section 365(j)*

The Bankruptcy Court, in reliance upon the reservation of a 1/32nd overriding royalty in favor of Delta and Louisiana jurisprudence determined that the transaction was a "sublease" under the law of Louisiana, and should be similarly classified for purposes of Section 365; and that as a result, Damson is not entitled to a lien under Section 365(j) of the Bankruptcy Act. This holding Damson insists, is incorrect as a matter of law. The second issue urged by Damson concerns being in "possession" as contemplated by Section 365(b). This issue becomes relevant only if Damson is determined to be a lessee or sub-lessee. Nevertheless, for the record, we note our complete concurrence in the Bankruptcy Judge's conclusion that Damson was not entitled to remain in possession as it did not have possession as is envisioned by the provisions of 11 U.S.C. § 365(b)(1) at the time of the reject. We accept his findings in this regard to be correct.

No useful purpose is to be served by a recitation of the contract provisions, which are made a part hereof by reference. Counsel for the respective parties (by briefs) argue extensively as to whether Louisiana or Texas Law should govern. Whether Texas law applied because of the language in the Damson agreement matters not. The core issue has to be what law applies to the transfer of an interest in immovable property located in Louisiana. Whether a Texas court applies Louisiana law or a Louisiana court applies Louisiana law, the outcome must be the same. So strong is the interest of Louisiana in the classification of immovables found within its borders that any Texas Court faced with the issue would apply Louisiana law to resolve the dispute. Texas law, when dealing with immovable property in another state, requires that the courts apply the substantive rules of the state where the property is located. *Holt v. Guerguin,* 106 Tex. 185, 163 S.W. 10 (1914); *Colden v. Alexander,* 141 Tex. 134, 171 S.W.2d 328 (1943); *Estabrook v. Wise,* 506 S.W.2d 248 (Tex.C.C.A. Tyler 1974); *Echols v. Wells,* 508 S.W.2d 118 (Tex.C.C.A.1973).

---

1. These findings and conclusions of the Bankruptcy Judge are made a part hereof by reference.

### Louisiana Law

The distinction between a sublease and assignment under Louisiana law was substantially altered in 1974 with the adoption of the Louisiana Mineral Code.[2] While the Louisiana Mineral Code kept the nominal distinction between "sublease" and "assignment", the functional differences were substantially eliminated,[3] and the minor remaining technical differences[4] should not control the classification of the transaction for purposes of Bankruptcy Code.

The arbitrary and inequitable effect of such a classification was explained in the following statement made prior to the adoption of the Mineral Code:

> The astounding thing about this judicial definition is the doctrine that a transfer for any consideration except cash is a sublease ... But there are many sales contracts which stipulate royalty as part of the consideration. There are sales of books, patents, moving pictures which stipulate royalty as part of the purchase price. These do not become subleases simply because they were not made for cash. Royalties stipulated as consideration for a true sublease (leased by a lessee) may be rent, but royalty as consideration for the sale of a lease is not rent. The method of payment of the consideration is not a determining factor in the distinction of a sublease from an assignment. A paid-up primary term will not convert a mineral lease into an assignment. The lease remains a lease because it retains the attributes and characteristics of a mineral lease. In the same manner, an assignment should be considered an assignment whether the consideration is to be paid in cash, lump sum or by installments, or by cash with other considerations or services. The distinguishing feature is the transfer of title to the basic lease. The contract has none of the characteristics of a lease. The transferee assumes all the obligations of the basic lease. The transferee's obligations are identical under each contract, regardless of the method of payment. He has a vendor-vendee, not a lessor-lessee relationship with his assignor.

Scott, "More on Assignment and Sublease Problems in Louisiana Mineral Law," L.S.U. 12th Ann.Inst. on Mineral L., 39, 52–53 (1965). This need for the essential functional equivalence of the two relationships as intended by Louisiana Mineral Code was recognized in *Cameron Meadows Land Company v. Bullard*, 348 So.2d 193 (La.App. 3d Cir.1977), where the court considered "the vexing problems which might arise as a result of the instrument of transfer being characterized as a sublease as opposed to an assignment." *Id.* at 198. One such vexing problem was the ability of a "sublessor" to grant an effective release against his sublessee although the sublessor in reality had not retained any interest in the property.

The jurisprudence prior to the Mineral Code unquestionably distinguished between the two legal relationships and found different obligations to exist depending upon whether the transaction was classified as a sublease or assignment. Articles 128–132 of the Louisiana Mineral Code substantively altered the jurisprudence and equated the two relationships. As noted

---

**2.** Articles 128–132 of the Louisiana Mineral Code provide as follows:

128. To the extent of the interest acquired, an assignee or sublessee acquires the rights and powers of the lessee and becomes responsible directly to the original lessor for the performance of the lessee's obligations.

129. An assignor or sublessor is not relieved of his obligations or liabilities under a mineral lease unless the lessor has discharged him expressly and in unity.

130. A partial assignment or partial sublease does not divide a mineral lease.

131. A mineral lessor must accept performance by an assignee or sublessee whether or not the assignment or sublease is filed for registry.

**3.** In fact, one commentator has concluded, "In the 1975 Mineral Code R.S. 31:128 abolished the distinction between subleases and assignments, making either type of holder directly liable to the original lessor." 3 Summers, *Oil and Gas* § 553 n. 41.12 (1984 Supp.)

**4.** *See* McCollam, "A primer for the Practice of Mineral Law under the New Louisiana Mineral Code", 50 *Tul.L.Rev.*, 729, 829 (1976).

by one commentator, "[t]he effect of these changes [by the Mineral Code] is to provide for certain common results flowing from the execution of either an assignment or a sublease."[5] The motivating factor for eliminating the functional differences was to avoid the inequitable results caused by the classification which were not intended by any of the parties. One such unintended and inequitable result would occur if the clear intentions of Delta and Damson in this regard were disregarded, and Damson was classified as a "sublessee" solely by virtue of the reservation of one thirty-second (1/32) overriding royalty by Delta. We are, of course, fully aware that the Bankruptcy Code does not attempt to define or distinguish the terms "sale", "lease" and "assignment". But, we are not bound by the use of the term "lease" in a state law context in our determination of the exact nature of the contract between the parties under section 365. In the case of a sale/lease back transaction, we are required to analyze the economic realities of the transaction and the true intention of the parties to determine whether the transaction is a "lease," a "sale" or a "security interest" for purposes of the Code. *In re Rojas*, 10 B.R. 353 (B.A.P. 9th Cir.1981). Regardless of the standards employed, this determination [between a sale and a lease] should not be a mechanical one and must be controlled by the particular circumstances of this case.

Louisiana law defines a mineral lease as "a contract by which the lessee is granted the right to explore for and produce minerals." LA R.S. 31:114. A mineral lease is a "mineral right" and as such is an incorporeal immovable. Unlike the ordinary lease situation, the mineral lessor does not have an affirmative duty except for warranty of title and non-interference. La.R.S. 31:119–120.

The Bankruptcy Judge placed reliance upon jurisprudence prior to the adoption of the Louisiana Mineral Code. The distinction between a sublease and an assignment

was substantially altered in 1974 with the adoption of the Louisiana Mineral Code.

■ Under Louisiana law, a mineral lease is to be treated as a real right, an incorporeal immovable, which can be alienated and mortgaged to third parties. It is not the convential lease contemplated by Section 365, but is in fact a real right in favor of another. We find that under the circumstances here, the distinction between "sublease and agreement" is without substantive effect for the purposes of Section 365.

■ Damson is entitled to the statutorily imposed protection of 11 U.S.C. § 365(j), a lien upon the property which was the subject of the rejected contract. This lien is for $1,000,000.00 (the amount of the payment) and for nothing more. Of course, Damson is entitled to any damages resulting from the rejection breach in addition to its one million dollar claim, as an *unsecured* creditor of the estate.

### Nothing More

Damson argues that it is entitled not only to the 365(j) lien but that the Court should fashion adequate protection by the granting of an administrative priority, and that it is entitled to be adequately protected against depreciation and/or loss of use of its collateral while in the hands of the debtor. The Bankruptcy Judge initially agreed with Damson's contention, but in its January 31, 1985 ruling reversed itself finding the arguments in support of that position to be flawed and without merit. We agree with the reasoning contained in this January 31, 1985 ruling, adopt it as our own, and cite from it:

As indicated the court now finds Damson's argument to be flawed; and as a corollary, upon further reflection the court also finds that its own original judgment in this matter is equally flawed and defective and is thus hereby vacated.

In spite of the appealing ring of logic contained within Damson's argument and regardless of what merit the argument

---

5. McCollam, "A Primer for the Practice of Mineral Law under the New Louisiana Mineral Code," 50 *Tul.L.Rev.* 729, 831 (1976).

might have as applied to the typical secured creditor situation, it nevertheless has no application given the facts of the instant case. The chief fault of the argument is the almost mechanical way in which it tends to apply the term(s) secured status/secured creditor. It is true that some cases have referred to the lien created by 365(j) as a form of "security interest", however, such statements should not be taken out of context as Damson here attempts to do. For example, one case which contains such a statement and upon which Damson appears to place particular reliance is *In re Nite Lite Inns*, 13 B.R. 900, 910 (B.Ct.S.D.Calif.1981) which dealschiefly with a question involving the proper definition of "purchaser" for the purposes of applying Sec. 365(j). The case itself however points out, at footnote 15, that secured status as it relates to the lien of 365(j) should not be confused with the "secured status" which results from consensual liens and to which reference is made in other sections of the Code. Interestingly the note goes on to point out as a specific example: the holder of a 365(j) lien is not entitled to "interest and attorneys fees" as would be available to the consensual secured lien claimant according to the provisions of 11 U.S.C. § 506(b), *Nite Lite* id., note 15. Not only does this court agree that the same should apply to the *American Mariner* theory advanced by Damson, but, in fact, the whole basis of the discussion contained in *American Mariner* to which Damson refers, is that there the court was dealing with a "bargain for" consensual right to interest. By contrast, the 365(j) lien is a limited and closely defined statutory right that takes place by mere operation of law upon the happening of certain events. Specifically, as is clear from its very wording, Section 365(j) is intended to give a limited form of protection to the non-debtor vendee upon rejection of the contract. That protection is restricted to a lien covering only the debtor's interest in the property forming the subject of the rejected contract. If in order to secure that same said interest this court

were to grant in addition to the 365(j) lien, the supplemental protection which Damson now seeks, the restriction contained in Section 365(j) would have little or no meaning. The unambigious intent of the 365(j) provisions cannot be altered by simply labeling it a "secured claim" and then merely, and blindly, plugging that label into the *American Mariner* analysis. Without any closer relationship to the instant fact than that, to jump as Damson does from 365(j) lien = "secured status" = adequate protection = administrative priority, amounts to no more than sheer sophistry in which this court will refuse to engage. If Congress had intended that the disappointed vendee be given an administrative priority or other forms of adequate protection in addition to or in lieu of the lien granted by Section 365(j), it surely could have done so but it did not. In effect the lien is the "adequate protection" Congress has chosen to protect the debt owed to such a vendee. No amount of alchemy can transform that congressionally mandated protection into something greater than it is, a lien against the property and nothing more.

Further, even if this court were to find that Damson was a secured creditor in the standard sense and thereby entitled to the protection discussed in *American Mariner*, its argument as presently advanced would still fail. This is so because if the 365(j) lien creates a "security interest" in anything, it is in the property as previously stated and not the one million dollars as urged by Damson, i.e. it is the real estate, and not the money, which becomes collateral entitled to adequate protection.

Judge Bernard correctly held that the type of liens which the code envisions as needing additional protection are consensual liens arising from the parties armlength transaction in establishing those liens. The lien created by 365(j) is a lien which comes into being by operation of law. This lien is all the adequate protection which is intended for a purchaser of real property whose contract is rejected.

Giving additional protection as Damson requests would amount to giving it double protection at the expense of all other creditors who may not be protected (unsecured) or may have just one protection (secured).

Counsel for Damson are to prepare and submit an appropriate judgment in accordance with this Memorandum.