SNEED, Circuit Judge:
 

 The Official Committee of Creditors of the debtor, Texas Research, Inc., appeals the decision of a district court in a bankruptcy case. The Committee seeks to avoid a post-petition security interest that the debtor gave to one of its creditors, Union Bank. The bankruptcy court denied relief on grounds that Union Bank had surrendered an equivalent value in exchange for the security interest. The district court upheld the denial and we affirm.
 

 I.
 

 FACTS AND PROCEEDINGS BELOW
 

 Texas Research licensed Healthdyne, Inc., to use its technology in exchange for a $300,000 promissory note. Texas Research then pledged the promissory note to Union Bank as security for a $200,000 loan. When Healthdyne, on May 1, 1984, did not make its first payment on the note, Texas Research, on May 2, 1984, notified Health-dyne that it was rescinding the license. Healthdyne then tendered a $100,000 check to Union Bank, representing the payment that it had missed. Healthdyne made the check payable to Union Bank and Texas Research, but Texas Research refused to indorse it.
 

 Creditors filed an involuntary bankruptcy petition against Texas Research on May 29, 1984. In the bankruptcy court, Texas Research moved to establish either that Healthdyne’s failure to make a timely payment on the promissory note had given Texas Research the right to terminate the license or, alternatively, that Texas Research could reject the license as an exec-utory contract. When Union Bank quite understandably objected to the motion, the parties settled the dispute.
 

 Their settlement agreement provided that Union Bank would receive a so-called “replacement lien” on any consideration that Texas Research obtained by reselling the technology that it had licensed to He-althdyne. Union Bank, in exchange, made three promises. First, Union Bank promised to drop its objection to Texas Research’s motion and thus forego its interest in the Healthdyne note. Second, Union Bank promised to return Healthdyne’s check. Third, Union Bank promised to lend an additional $50,000 to Texas Research.
 

 After the settlement agreement took effect, Texas Research resold its technology. Banner Electric, Inc., a member of the Creditors’ Committee, then brought an adversary proceeding pursuant to Bankr.R. 7001(2) to determine the extent, the validity, and the priority of Union Bank’s replacement lien. The Creditor’s Committee intervened, seeking to avoid the lien pursuant to 11 U.S.C. §§ 544, 547, & 548 (1982 & Supp. IV 1986). Finding that 11 U.S.C. § 549(b) (1982) governed the transaction, the bankruptcy court ruled that the replacement lien was valid because Union Bank had given a “fair and reasonably equivalent value” in exchange for it. Excerpts of Record at 131.
 

 The district court agreed. Although the district court found that Union Bank’s promise to return the $100,000 check was worthless because Union Bank could not negotiate the check without Texas Research’s indorsement, the court agreed that Union Bank had given an equivalent value in exchange for the replacement lien by dropping its objection to Texas Research’s motion and by offering the $50,000 line of credit to Texas Research. The Committee appealed to this court.
 

 II.
 

 JURISDICTION
 

 The bankruptcy court had jurisdiction under 28 U.S.C. §§ 157 & 1471. The district court had jurisdiction under § 158. This court has jurisdiction under § 1291.
 

 
 *1163
 
 III.
 

 STANDARD OF REVIEW
 

 This court accepts a bankruptcy court’s findings of fact unless they are clearly erroneous, but decides issues of law de novo.
 
 See Pierson & Gaylen v. Creel & Atwool (In re Consolidated Bancshares, Inc.),
 
 785 F.2d 1249, 1252 (5th Cir.1986).
 

 IV.
 

 EQUIVALENT VALUES
 

 We agree with the district court that § 549(b) of the Bankruptcy Code governs the principal issue in this dispute. It provides that a post-petition transfer is valid to the extent of any value given in exchange for it after the commencement of the case. 11 U.S.C. § 549(b) (Supp. IV 1986). The parties in this proceeding disagree both about the value of Union Bank’s replacement lien and the value of the consideration that Union Bank gave in exchange for it. We conclude, contrary to the Committee’s position, that both values were speculative at the time of the settlement and that the bankruptcy court could have found them to be equal.
 

 A.
 
 Time of Measuring Value of Replacement Lien
 

 To determine the value of the replacement lien for the purposes of § 549(b), we must fix the appropriate time for measuring it. Although neither party has offered authority for its position, each has suggested a time that would further its interests. Union Bank wishes to measure the lien’s value at the time of the settlement. It argues that the value of the lien was entirely speculative at that time because Texas Research had not yet resold its technology. The Committee, by contrast, wishes to measure the value of the lien at the time of this proceeding. Using this point in time enables the Committee to argue that the value is $272,723.46, the amount of the debt owed to the Bank that the replacement lien eventually came to secure.
 

 Although none of the few cases under § 549(b) has addressed the issue, we hold that the value of post-petition transfers should be measured at the time they occur. Measuring a transfer’s value at this time will encourage settlements and other transactions with debtors by reducing the risk that a court will strike them down when further information becomes available.
 
 Cf. Nadel v. Fruitville Pike Assocs. (In re Burke),
 
 60 B.R. 665, 670 (Bankr.D. Conn.1986) (stating § 549’s policy of protecting transferees); Countryman,
 
 The Concept of a Voidable Preference in Bankruptcy,
 
 38 Vand.L.Rev. 713, 740-41 (1985) (discussing the comparable problem of valuing collateral transferred to a secured party during the prepetition preference period). We thus agree with Union Bank that the replacement lien had a speculative value.
 

 B.
 
 Value of Consideration Given by Union Bank
 

 To determine the value of the consideration that Union Bank gave in exchange for the replacement lien, each of Union Bank’s promises must be considered. The parties agree, as indeed they should, that Union Bank’s promise to provide a $50,000 line of credit to Texas Research was worth $50,000. They also agree that Union Bank’s promise to return Health-dyne’s check was worthless because Union Bank could not negotiate the check without the Texas Research’s signature. This leaves only the value of Union Bank’s promise to drop its objection to Texas Research’s motion to terminate its Health-dyne’s license subject to dispute.
 

 The Committee argues that Union Bank’s promise not to object had no value because Texas Research unilaterally had the right under Tex.Bus. & Comm.Code § 9.318(b) (Vernon Supp.1988) to rescind the contract. Union Bank, by contrast, contends that its promise had value because Texas Research had no clear right to rescind over its objection.
 

 We agree with Union Bank. We do so for two reasons. First, no case under § 9-318(b) or any other section of the Uniform Commercial Code decided at the time of the settlement in any jurisdiction direct
 
 *1164
 
 ly supported the Committee’s position. Indeed,
 
 FDIC v. Registry Hotel Corp.,
 
 658 F.Supp. 311 (N.D.Tex.1986), the only case that the Committee has cited, not only came after the settlement, but it also addressed a different issue. It held that an assignee/security-holder had no rights against the obligor when the obligee/as-signor defaulted and the obligor rescinded the contract.
 
 See id.
 
 at 314-15. This case, by contrast, asks whether the assignee/se-curity-holder has any rights when a nonde-faulting obligee/assignor rescinds.
 

 Second, commentators at the time had stressed that the issue had no clear answer. Although the Committee cites Gilmore,
 
 The Assignee of Contract Rights and His Precarious Security,
 
 74 Yale L.J. 217 (1964), the article actually supports Union Bank’s position. The article states that it is a “reasonable assumption” that the assignee should have a “right to sue for repudiation or anticipatory breach by the contract obligor ... particularly in a case where he has made an advance to the assignor in reliance on the account debtor’s going through with his part of the con-tract_”
 
 Id.
 
 at 259. Professor Clark, in addition, had written that it is an open question whether the right under § 9-318(b) “to ‘modify’ an assigned contract include[s] the right to terminate it,” and he has not modified his opinion to date. B. Clark,
 
 The Law of Secured Transactions under the Uniform Commercial Code
 
 1111.4[2], at 11-13 (1980 & Supp.1988) (citing
 
 Registry Hotel).
 

 As a result, we find that the value of Union Bank’s promise not to object, like the value of the replacement lien, was speculative at the time of the settlement agreement. The bankruptcy court deemed the values commensurate, and this court cannot rule that its findings were clearly erroneous.
 

 V.
 

 CROSS-COLLATERALIZATION
 

 The Committee argues next that the settlement agreement impermissibly cross-collateralized Union Bank. Cross-collater-alization occurs when a debtor provides security for preexisting unsecured debt in return for new loans.
 
 See Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.),
 
 596 F.2d 1092, 1094 (2d Cir.1979). To establish an existing unsecured debt, the Committee argues that Union Bank’s original loan to Texas Research was unsecured at the time of the settlement because Union Bank’s rights in the Healthdyne contract had little or no value in light of Texas Research’s right to rescind. The Committee, therefore, contends that the settlement provided Union Bank with new security, namely the replacement lien, for previously unsecured debt.
 

 This contention encounters the same difficulty as did the Committee’s insistence that the Bank’s willingness to drop its objections to Texas Research’s motion had no value. That is, we disagree with the Committee’s contention that Union Bank had no interest in the Healthdyne note. Thus, we decline to decide whether the Bankruptcy Code would prohibit cross-collateralization in the situation that the Committee describes. At the time of the settlement, Texas Research had notified Healthdyne that it was rescinding their contract, but the legal effect of such notice on Union Bank’s interest was, and is, dubious. Texas Research, as noted above, might not have been able to rescind the contract over Union Bank’s objection. We thus find that Union Bank merely exchanged old security of speculative value for new security of speculative value and we conclude that no cross-collateralization could have occurred even if such is proscribed by the Bankruptcy Code.
 

 AFFIRMED.