In the Matter of TOPCO, INC., Debtor.

RIVER PRODUCTION, CO.,
INC., Appellee,

v.

Jack M. WEBB, Trustee, Appellant.

No. 88–2986.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1990.

Thad Grundy, Mark T. Womack, Hutcheson & Grundy, Houston, Tex., for appellant.

Janna L. Ivey, Thomas W. Graves, Adair & Myers, Houston, Tex., for appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before GOLDBERG, JOHNSON, and DUHE, Circuit Judges.

GOLDBERG, Circuit Judge:

### Statement of Facts

While this case does not deserve a Homeric epic, it has engaged in an Odyssey in time. *Nine* years ago, in 1981, Topco, Inc. ("Topco") filed a Chapter 11 petition in bankruptcy. Five years later, the bankruptcy court granted the trustee in bankruptcy's ("the Trustee") motion to convert the case from Chapter 11 to 7. Shortly after Topco entered Chapter 7, the Trustee solicited bids for Topco's oil and gas properties. The Trustee accepted B/C Joint Venture's ("B/C") high bid of $201,000 subject to review and approval by the bankruptcy court.

The Trustee and B/C memorialized the proposed sale in a letter agreement dated January 27, 1987 ("Letter Agreement"). The Letter Agreement provided the following: B/C agreed to purchase Topco's "right, title, and interest" in producing and nonproducing oil and gas properties to the extent of Topco's interest provided that the bankruptcy court approved the sale. Topco conveyed to B/C Topco's interest in oil field equipment and Topco's leasehold interests in numerous oil and gas wells.[1] The leases covering these properties allowed Topco to extract oil and gas from existing wells. In return, Topco paid royalties to the owners

---

1. The transaction also conveyed other interests not relevant to this case.

of the land where the wells were located. Many, if not all, of these leases contained a provision that automatically terminated the arrangement if Topco failed to produce oil or gas for more than sixty days.

B/C reserved twenty days to review title, revenue, and expense reports and to inspect the physical assets included in the sale. During that twenty day period, B/C could terminate its purchase of Topco's assets "if not satisfied." B/C had to deposit $201,000 in escrow within five days after the parties executed the Letter Agreement. B/C could terminate its purchase and recover its escrow deposit if the bankruptcy court did not approve the sale by March 30, 1987. The parties agreed to close no later than eleven days after the bankruptcy court approved the sale or at a later date if the parties agreed. The Letter Agreement did not specify the consequences of failing to close by the eleven day deadline.

On March 19, 1987, the Trustee requested court approval to sell the assets to B/C under the terms of the Letter Agreement. In his written motion, the Trustee informed the bankruptcy court that Topco could no longer operate its oil and gas wells. Shutting down those wells, the Trustee alleged, would damage the estate. The Trustee informed the court that 11 U.S.C. Section 365 of the Bankruptcy Code required the bankruptcy court to authorize the Trustee to assume the unexpired leases in order to assign those leases to B/C as part of the sale.[2] In order to comply with Section 365(c)(3), the Trustee alleged that no defaults existed in the leases and that B/C could adequately perform Topco's obligations in the leases.[3]

The motion further informed the court that B/C (1) agreed to purchase Topco's assets only to the extent of Topco's interest in those assets; (2) agreed to waive the requirement of formal title opinions covering the leases; and (3) agreed to waive any reliance on information provided by the Trustee, his operator, or his attorneys regarding the assets. The Trustee explained that "[t]his waiver of reliance and assumption of risk by B/C Joint Venture resulted in the reduction of considerable expense to the Trustee in negotiating this sale, and was an important factor in arriving at an agreement for the price to be paid by B/C." The Trustee attached as exhibits to the motion a copy of the Letter Agreement and several schedules detailing Topco's interests in oil and gas wells and describing the oil equipment included in the sale.

The bankruptcy court heard the Trustee's motion on April 15th and 16th and May 6th, 1987. On April 15th, the Trustee's expert witness valued the assets being sold at $250,382. The Trustee submitted an appraisal valuing Topco's interests in some, but not all, of the wells at $250,000. The current operator of the wells testified that he offered $157,000 for Topco's oil and gas properties. An expert witness for the debtor (who opposed the sale) valued the assets at $2,000,000. No one from River Production attended the hearing. However, an attorney bid $225,000 for the properties on behalf of River Production.

On April 16th, the bankruptcy court permitted all interested parties to bid orally for the property. The Trustee accepted the highest offer, from River Production, for $450,000 in cash, subject to the court's approval. River Production previously purchased all of Topco's unsecured claims and one of its principals previously viewed many of Topco's wells at the behest of the

2. Section 365(c)(3) provides:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contractor lease prohibits or restricts assignment of rights or delegation of duties, if—such lease is of non-residential real property and has been terminated under applicable bankruptcy law prior to the order of relief.

3. Paragraph six of the Trustee's motion states:

In order to effect such sale, the Trustee must be authorized to assume the unexpired oil, gas and mineral leases entered into by the debtor and listed on Exhibit "B" attached hereto and incorporated herein by reference, and to assign the interests of the estate in them to B/C Joint Venture, pursuant to 11 U.S.C. Section 365(c). The Trustee alleges, upon information and belief, that no defaults exist in such leases, and adequate assurance of future performance will be provided by B/C Joint Venture.

debtor. During the April 16th hearing, River Production orally agreed to "step into B/C's shoes" and to waive the twenty day period for examining Topco's title in the properties. River Production also informed the court that the sale would close eleven days after the bankruptcy court entered "this Order." In response to testimony addressing whether River Production's purchase included a certain lease, River Production reiterated that it purchased the properties "without warranty."

Three weeks later, during the last day of the hearing, the question whether River Production's purchase included a certain lease cropped up again. River Production again told the court that: "If the Trustee doesn't own it, we don't get it." River Production was "buying the pig in the poke." That same day, during testimony about whether the purchase included Topco's possible liabilities to the State of Texas and the particular lease, River Production again acknowledged its lack of information about the assets it intended to purchase:

Mr. Graves [River Production's lawyer]: ... The witness testifies that this well, if it's completed in these zones, of which there is some risk, could possibly produce this much, but the other side of that they're testifying this Nash well hadn't been produced in five years. Well, what's the title like? Is the lease still in effect? Did the lease expire two years ago? My client is taking all of that risk. They're taking the risk of the [Texas] Railroad Commission coming in and requiring us to plug wells. That's part of what went into—to my client's decision to bid what they bid, Your Honor."

Before the bankruptcy court approved the sale, the operator testified that only a small percentage of the wells were producing and that many of the royalty owners were dissatisfied with Topco's performance.

On May 6th, 1987, the bankruptcy court orally approved the sale to River Production. On May 18th, after a hearing, the bankruptcy court issued its order approving the sale. The bankruptcy court entered that order on May 27th. The order approved the sale to River Production on the same terms outlined in the Letter Agreement between B/C Joint Ventures and the Trustee with the following exceptions (contained in paragraph 14 of the order):

(1) River Production would pay $450,000 rather than $201,000.

(2) River Production waived review of title work, actual revenues and operating expenses, physical inspection of the property, and any extension of time to review, inspect, or terminate its offer.

(3) River Production agreed to deposit $225,000 in cash with the Trustee as earnest money pending closing.

After the bankruptcy court entered its order, River Production deposited the $225,000 earnest money as agreed. Before the parties could close the sale, however, the debtor and certain creditors asked the bankruptcy court to reconsider its order approving the sale. On July 17, the bankruptcy court denied that motion. On July 24, the debtor and certain creditors appealed to the district court to set aside the sale. They also requested that the bankruptcy court stay the sale pending appeal. On July 27, the bankruptcy court orally stayed the sale.

On the day the bankruptcy court stayed the sale, River Production notified the Trustee that it "terminated" its offer to purchase and asked the Trustee to return its escrow deposit. River Production cited a provision in the Letter Agreement that permitted B/C to terminate its offer if the sale did not close by March 30, 1987.

When the Trustee did not return River Production's earnest money deposit, River Production sought a declaratory judgment in bankruptcy court rescinding the sale. River Production maintained that most of the oil and gas leases the Trustee listed on the schedules attached to his motion to assume the leases expired by April 16, 1987 (when River Production offered to buy them). They expired, alleged River Production, because the debtor or the Trustee failed to comply with the terms of the leases. River Production alleged that by September 11, 1987 (the earliest possible

closing date), third parties had leased most of the oil and gas wells previously leased by Topco. River Production claimed that closing the sale under these circumstances would leave River Production with only a small portion of the leases it thought it bargained for in April.

On September 1, the district court dismissed the appeal in the original bankruptcy case. On September 3, the Trustee informed River Production that he could close the sale immediately. River Production refused to close.

On September 30, 1987, the chief district judge removed this case from the bankruptcy court to the district court. After a one day bench trial, the district court found for River Production. The district court found that the contract between River Production and Topco consists of paragraph 14 of the bankruptcy court's order (stating that River Production purchased the properties under the same terms as B/C in the Letter Agreement except that the price increased, River Production waived its right to review the properties and to terminate the contract, and that River Production agreed to deposit $225,000 in escrow); and the exhibits attached to the Trustee's motion (the Letter Agreement and the schedules describing Topco's oil and gas assets).

Based on this contract, the district court concluded that River Production waived its right to review the title, operations, and leases and to terminate the offer within twenty days if River Production was not satisfied. River Production did not waive, said the district court, its right to terminate the offer if the bankruptcy court did not approve the sale by March 30, 1987. However, the district court also concluded that the parties agreed to ignore the March 30, 1987 deadline because the deadline passed before River Production bid on the properties.

However, the district court also found that the Trustee did not close the sale within eleven days from the date the bankruptcy court entered its order as the Letter Agreement required. The Trustee could not do so because the bankruptcy court stayed the sale pending the appeal to the

district court. The parties could not close until September 1, 1987, more than three months after the bankruptcy court issued its order approving the sale. Because three months exceeds eleven days, the district court concluded, River Production could rescind the contract and recover its escrow deposit.

The district court also stated three other grounds for its ruling in favor of River Production. First, it found that River Production could rescind the contract because the Trustee misrepresented the status of Topco's assets in his motion and attached exhibits requesting authorization to assume the various leases. The district court found that the Trustee knew that some of the leases had expired because of the Trustee's default, and that even if he did not, by virtue of his obligations to the creditors, he should have known. The district court also found that River Production reasonably relied on the Trustee's assertions in its motion as well as the schedule of properties attached to the motion.

Second, the district court alternatively held that River Production could rescind the contract due to mutual mistake. It found that neither the Trustee nor River Production realized that Topco no longer had rights to many of the leaseholds listed in the Trustee's schedules attached to his motion. Third, the district court found that River Production could rescind the contract because of failure of consideration. It found Topco's consideration reduced because many of Topco's leases no longer existed.

The Trustee now appeals. He argues that River Production did not timely terminate its offer and could not rescind the contract due to failure of consideration, mutual mistake, fraud or misrepresentation because none occurred. In its reply, River Production argues that this court lacks jurisdiction to hear this appeal. In addition, River Production argues that it timely terminated the contract and could rescind the contract due to failure of consideration, mutual mistake, and fraud and misrepresentation.

## Standard of Review

In bankruptcy matters, district courts play two roles. First, they serve as appellate courts reviewing appeals from bankruptcy courts. Second, they serve as trial courts hearing bankruptcy matters originally. In this case the district court acted as a bankruptcy trial court rather than as a bankruptcy appellate court. However, the district court reviewed portions of the bankruptcy court proceedings submitted by the parties as evidence to reach its decision in this case.

We review the district courts' findings just as we review the bankruptcy court's findings in the bankruptcy proceeding that generated this suit. For both, we look for clear error in findings of fact and review *de novo* issues of law. *In re Killebrew,* 888 F.2d 1516, 1519 (5th Cir.1989); *In re Texas Research,* 862 F.2d 1161, 1163 (5th Cir.1989).[4] We find clear error when a review of the entire evidence leaves us "with the definite and firm conviction that a mistake has been committed." *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1308 n. 5 (5th Cir.1985) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

## Jurisdiction

■ The jurisdictional issues in this case require us to continue this Homeric Odyssey for yet a few more pages. They center on the meaning of various provisions in 28 U.S.C. Section 158. Section 158 provides:

(a) The district courts of the United States shall have jurisdiction to hear appeals from final judgments, orders, and decrees, and with leave of the court, from interlocutory orders and decrees, of

bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.[5] An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

\* \* \* \* \* \*

(c) An appeal under subsections (a) and (b)[6] of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.[7]

(d) The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

River Production argues that this court lacks jurisdiction to hear this appeal because the Trustee did not comply fully with Section 158. River Production argues that Section 158(a) governs jurisdiction for a first appeal in a bankruptcy case, whether from a bankruptcy court to a district court or from a district court hearing a bankruptcy case to a court of appeals. Pointing out that Section 158(a) *expressly* grants jurisdiction for appeals from bankruptcy courts to district courts, River Production argues that Section 158(a) *impliedly* grants jurisdiction for appeals from district courts sitting as trial courts in bankruptcy cases to courts of appeals because district courts function in these cases just like bankruptcy courts. In such cases, the district court decision, like bankruptcy court decisions, are "entered under" Section 158(a). This interpretation, River Production argues, in-

---

**4.** We may freely review the district court's decisions of law in its bankruptcy appellate capacity. *In re HECI Exploration Co.,* 862 F.2d 513 (5th Cir.1988).

**5.** 28 U.S.C. Section 157(a) states:
Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

**6.** Subsection (b) permits each circuit to establish bankruptcy appellate panels to hear certain cases on appeal from bankruptcy courts.

**7.** Rule 8002 of the Bankruptcy Rules gives parties ten days from the date of entry of a judgment, order, or decree in which to appeal. This ten day requirement is jurisdictional and cannot be waived. *In re Aguilar,* 861 F.2d 873, 874 (5th Cir.1988).

sures the rapid decision-making the Bankruptcy Code envisions in bankruptcy cases.

In this case, River Production argues, the district court acted as a bankruptcy trial court because it tried a bankruptcy matter (as opposed to reviewing a bankruptcy matter on appeal from a bankruptcy court). Because the district court acted as a bankruptcy trial court rather than a bankruptcy appellate court, its decision is a decision "under" Section 158(a). Appeals from decisions entered under Section 158(a) must comply with the time limits established by Section 158(c). The Trustee filed his appeal after the time limit imposed by Section 158(c) expired. The time limit is jurisdictional and cannot be waived. Therefore, River Production concludes, this court lacks jurisdiction to hear the Trustee's appeal.

In the alternative, River Production argues that if Section 158(a) does not govern jurisdiction over the appeal from the district court's decision, 28 U.S.C. Section 1291 does. However, unlike an ordinary appeal under Section 1291, Fed.R.App.P. 4(a) does not establish the time limit for appeal, says River Production.[8] Instead, Section 158(c) establishes the time limits for appeal from the district court order. Because the Trustee did not appeal within the time limits imposed by Section 158(c), River Production concludes, this court lacks jurisdiction.

*Section 158(a).* Section 158(a) expressly grants *district courts* jurisdiction to hear appeals from *bankruptcy courts'* decisions. Section 158(a) states that "district courts ... shall have jurisdiction to hear appeals ... from ... orders and decrees [ ] of bankruptcy judges" for cases referred by district courts to bankruptcy judges under Section 157(a). *See In re Louisiana World Exposition*, 832 F.2d 1391, 1394–1395, (5th Cir.1987).

However, Section 158(a) does not discuss the role of district courts in cases not referred to bankruptcy courts under Section 157(a). Because it does not, we conclude that when district courts act as bankruptcy trial courts, i.e., when they do not review bankruptcy court decisions, Section 158 does not apply. *See Louisiana World Expo.*, 832 F.2d at 1395, n. 3. In this case, the district court sat as a bankruptcy trial court rather than as a bankruptcy appellate court. Therefore, Section 158(a) does not govern the Trustee's appeal to this court from the district court's decision.

Section 158(a)'s failure to mention much less expressly grant *courts of appeals* jurisdiction to hear any appeals supports our interpretation. Section 158(a) does not discuss appeals from either district court bankruptcy trial decisions or district court bankruptcy appellate decisions. Therefore, we will not assume that Congress intended Section 158(a) to govern any appeals from district courts to courts of appeals.[9]

*Section 158(c).* Section 158(c) creates an appellate structure for appeals from bankruptcy courts to district courts that parallels the appellate structure for appeals from district courts to courts of appeals.[10] However, Section 158(c) grants litigants just ten days to appeal from bankruptcy court decisions to district courts. *See* Bankr.R. 8002. In normal civil appeals, parties have 30 days to appeal. *See* Section 1291 and Fed.R.App.P. 4(a)(1).

Because Section 158(c) establishes appellate procedure only for appeals from bankruptcy courts to district courts, Section 158(c) does not establish the time limit for appeals to courts of appeals. *See* 1 Collier on Bankruptcy, para. 3.03 (15th ed. 1989). Section 158(c) does not govern appeals to

---

**8.** Rule 4(a) states:

In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the date of entry of the judgment or order appealed from * * * *.

**9.** This does not leave litigants without recourse, however. Two other provisions, Section 158(d) and Section 1291, grant courts of appeals jurisdiction to hear appeals from district courts' decisions. *See* discussion below.

**10.** Section 158(c) also establishes the time limits for appeals under Section 158(b).

courts of appeals even when district courts sit as bankruptcy trial courts rather than bankruptcy appellate courts. Because the Trustee appeals to this court rather than to a district court, this appeal does not fall within Section 158(a). Therefore, the Trustee need not comply with Section 158(c). Instead, he must comply with Rule 4(a)(1). The Trustee filed a timely appeal under Rule 4(a)(1). Therefore, we have jurisdiction over his appeal.

Previous cases support this interpretation. While we have never decided this issue, we have assumed that Rule 4(a)(*4*) establishes the time limits for interlocutory appeals from district court orders in bankruptcy matters originating in district courts. *Browning v. Navarro*, 887 F.2d 553, 557 (5th Cir.1989). We have not decided whether Section 158(c) establishes time limits for appeals to courts of appeals, whether from district court bankruptcy appellate decisions or from district court bankruptcy trial decisions.

*Section 158(d).* This last provision is the first and only provision in Section 158 that governs appeals to courts of appeals. Section 158(d) limits its jurisdictional grant solely to courts of appeals. It does not grant jurisdiction to district courts reviewing decisions in cases referred to bankruptcy courts under Section 157(c) even though those district courts function as first line courts of appeals in those cases.[11] Nor does Section 158(d) grant jurisdiction to district courts sitting as bankruptcy trial courts. Instead, Section 158(d) expressly grants jurisdiction to courts of appeals over decisions "entered under" Section 158(a) and (b). *See In re Amatex Corp.*, 755 F.2d 1034, 1038 (3rd Cir.1985). Decisions "entered under" Section 158(a) and (b) are decisions rendered by district courts sitting as appellate courts reviewing bankruptcy court decisions. *See* discussion above; *In re Benny*, 791 F.2d 712, 716, 718 (9th Cir.1986), (rejecting *In re Teleport Oil Co.*, 759 F.2d 1376 (9th Cir.1985) (*per curiam*)). Therefore, Section 158(d) grants jurisdiction to courts of appeals over appeals from district courts' bankruptcy appellate decisions. *See In re Greene County Hospital*, 835 F.2d 589, n. 2 (5th Cir. 1988); *In re Phillips*, 844 F.2d 230, 233 (5th Cir.1988); *Louisiana World Expo.*, 832 F.2d at 1394–1395; *In re Koerner*, 800 F.2d 1358, 1360 (5th Cir.1986).

Section 158(d) does not expressly govern jurisdiction over *all* bankruptcy cases reviewed by courts of appeals. Section 158(d) refers only to matters entered under Section 158(a) and (b). Section 158(d) does not govern appeals to courts of appeals in those cases where the decision appealed was not "entered under" Section 158(a). *Benny*, 791 F.2d at 716. When district courts decide bankruptcy matters firsthand, they do not enter their decisions under Section 158(a). Therefore, Section 158(d) does not grant us jurisdiction to hear those appeals. *Louisiana World Expo.*, 832 F.2d at 1395, n. 3; *Koerner*, 800 F.2d at 1360; *Amatex*, 755 F.2d at 1035; *Browning*, 887 F.2d at 557.[12]

---

**11.** Section 158(a) governs district court bankruptcy appellate jurisdiction in Section 157(c) cases.

**12.** This circuit has issued numerous opinions addressing the apparent different treatment of interlocutory and final orders established by Section 158(a) and (d). Section 158(a) grants *district courts* jurisdiction to review *interlocutory* orders of bankruptcy courts. Section 158(d) grants *courts of appeals* jurisdiction to review *final* orders of district courts. *Phillips*, 844 F.2d at 233. (This assumes that no district order reviewing a bankruptcy court interlocutory order under Section 158(a) will constitute a final district court decision under Section 158(d).) But Section 158(d) does not grant *courts of appeals* jurisdiction to review *interlocutory* orders of district courts. *Browning*, 887

F.2d at 557; *Greene County Hosp.*, 835 F.2d at 593–595. (This court may hear any nonfinal order that falls within the collateral order exception. *Greene County Hosp.*, 835 F.2d at 596.)

For example, in *In re Delta Services Industries*, 782 F.2d 1267, 1268 (5th Cir.1986), the district court affirmed a bankruptcy court order under Section 158(a). When the case came before us, we turned to Section 158(d) to determine our jurisdiction. We concluded that we lacked jurisdiction because the district court's order was not a final order and 158(d) granted us jurisdiction only to hear final orders. However, we did not consider whether Section 158 supersedes Section 1291 in appeals that do not originate in bankruptcy courts, nor did we consider what time limit applies to appeals governed by Section 158(d).

*Relationship between Section 158 and Section 1291.*

Section 1291 governs appeals to courts of appeals when district courts act as bankruptcy trial courts rather than as bankruptcy appellate courts. *Benny,* 791 F.2d at 718; *In re Salem Mortgage Co.,* 783 F.2d 626, 632, n. 15 (6th Cir.1986); *Amatex,* 755 F.2d at 1038; *Browning,* 887 F.2d at 557; *cf. Teleport,* 759 F.2d at 1378. Section 158(d) governs appeals to courts of appeals when district courts sit as bankruptcy appellate courts rather than as bankruptcy trial courts. *Louisiana World Expo.,* 832 F.2d at 1395, n. 3; *see also Amatex,* 755 F.2d at 1038. Bankruptcy decisions that do not fall within the scope of Section 158(a) reach courts of appeals through Section 1291. They must reach courts of appeals through Section 1291 because Section 158(d) governs courts of appeals' jurisdiction *only* for cases falling within the scope of Section 158(a). (*See* discussion above.)

However, we recently stated without explanation that Section 1291 grants jurisdiction to this court to hear an appeal from a district court decision where the district court functioned as an bankruptcy appellate court, i.e., an appeal to this court entered under Section 158(a). *Texas Research,* 862 F.2d at 1162. We did not state that Section 158(d) does not apply as well. Like many other courts, we apparently assumed that Section 1291 provides bankruptcy appellate jurisdiction without considering whether Section 158 supercedes or supplements Section 1291. *See, e.g., In re King Memorial Hospital,* 767 F.2d 1508 (11th Cir.1985) (*per curiam*); *Teton Exploration Drilling v. Bokum Resources,* 818 F.2d 1521, 1524 (10th Cir.1987); *In re Martin–Trigona,* 763 F.2d 135, 138 (2d Cir. 1985); *John E. Burns Drilling Co. v. Central Bank of Denver,* 739 F.2d 1489, 1491–1492 (10th Cir.1984) (*per curiam*).

■ Because we did not discuss the scope of Section 158(d), the decision leaves us free to conclude that Section 158(d) *as well as* Section 1291, govern jurisdiction over appeals to us from district court bankruptcy appellate decisions. Other courts have done the same, finding that Section 158(d) *concurrently* grants jurisdiction along with Section 1291 to courts of appeals over decisions entered by district courts under Section 158(a) or that whether or not bankruptcy decisions fall within section 158(a), Section 1291 serves as an alternative basis for jurisdiction. *See, e.g., Salem,* 783 F.2d at 632 & n. 15 (rejecting the *Teleport* decision that Section 158 serves as the exclusive basis of appellate jurisdiction in bankruptcy). Our conclusion also accords with the legislative history. At one point Congress proposed that Section 1291 serve as the source of courts of appeals' jurisdiction over matters previously heard by district courts sitting as bankruptcy appellate courts. S.Rep. No. 989, 95th Cong., 2d Sess. 18, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5804; *Salem,* 783 F.2d at 632, n. 15.

In contrast to *Texas Research,* in *Barrier,* we cited Section 158(d) for the proposition that this court exercises jurisdiction over all decisions of district courts in bankruptcy matters. *Barrier,* 776 F.2d at 1299. We held that courts of appeals cannot hear interlocutory orders in bankruptcy cases under 28 U.S.C. Section 1292. Instead, Section 158 governs. We stated without explanation that Section 158, "which appears to be comprehensive, clearly supercedes [ ] Section 1291, covering appeals from final judgments of the district court." *Barrier* did *not* decide whether Section 158(d) or Section 1291 grants jurisdiction over appeals from district courts hearing bankruptcy matters not covered by Section 158(a) and (b). *Id. See also First South Savings,* 820 F.2d at 708 (district court

We have also considered what route of appeal, if any, litigants have in cases where the district court denies a stay pending appeal of a bankruptcy court's order. In these cases, creditors may seek only a writ of mandamus under the All Writs Statute, 28 U.S.C. Section 1651. *In re First South Sav. Ass'n,* 820 F.2d 700, 708–709 (5th Cir.1987); *In re Barrier,* 776 F.2d 1298,

1299–1300 (5th Cir.1985). They cannot appeal to courts of appeals because Section 158(d) grants courts of appeals jurisdiction only over final orders issued by district courts reviewing bankruptcy courts decisions. District orders regarding stays are interlocutory, not final. Therefore, we cannot review them under Section 158(d).

refused to stay a bankruptcy order pending appeal). We cited *Teleport,* 759 F.2d 1376;[13] and *Regency Woods Apartments, Ltd.,* 686 F.2d 899 (11th Cir.1982)[14] for our interpretation of Section 158. *See also In re Chateaugay Corp.,* 838 F.2d 59, 62–63 (2d Cir.1988), *cert. granted by Pension Ben. Guar. Corp. v. LTV Corp.,* —— U.S. ——, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989) (Section 158(d) *exclusively* grants jurisdiction to courts of appeals over decisions entered by district courts under Section 158(a)).

*Barrier* may have collapsed inadvertently (1) bankruptcy cases on appeal from district court decisions reviewing bankruptcy court decisions with (2) bankruptcy cases tried by district courts and never referred to bankruptcy courts under Section 157(a). *Barrier,* 776 F.2d at 1299; *see also Chateaugay,* 838 F.2d at 62–63. Section 158(d) clearly grants courts of appeals jurisdiction over the former and just as clearly does not grant courts of appeals jurisdiction over the latter.

If we apply the standard announced in *Barrier* to all bankruptcy cases, we lack jurisdiction to review final district court orders in cases where district courts sit as bankruptcy trial courts.[15] Because we do not believe that Congress intended to limit courts of appeals' jurisdiction under Section 1291, we decline to follow *Barrier* to the extent it conflicts with our decision here today. Instead, we believe the better approach is that implicitly adopted in *Texas Research.* Both Section 1291 and Section 158 govern appeals to courts of appeals from district court decisions when district courts sit as bankruptcy appellate courts. Only Section 1291 governs appeals from district court decisions when district courts sit as bankruptcy trial courts. And in either case, Rule 4(a)(1) establishes the time limit for appeals, not Section 158(c).

### Elements of the Contract

We agree with the district court that the contract between River Production and the Trustee in this case consists of paragraph 14 of the bankruptcy court's order and the exhibits (the schedules of property assumed and a copy of the Letter Agreement) attached to the Trustee's motion. We disagree with the district court's conclusion that the motion itself does not constitute part of the contract between River Production and the Trustee. We construe the documents executed in connection with the sale together (*see In re Olm Associates,* 98 B.R. 271 (Bankr.N.D.Tex.1989)) and consider the entire contract to give effect to all provisions, so that none will be meaningless. *Cambridge Oil Co. v. Huggins,* 765 S.W.2d 540 (Tex.App.—Corpus Christi 1989); *Birdwell v. Ferrell,* 746 S.W.2d 338 (Tex.App.—Austin 1988). If provisions conflict, we must harmonize them. *See KMI Continental Offshore Production Co. v. ACF Petroleum Co.,* 746 S.W.2d 238 (Tex.App.—Hous.1987).

Either the motion and its attached exhibits constitute part of the contract or neither the motion and its attached exhibits constitute part of the contract. To conclude otherwise unfairly stacks the deck in favor of

---

**13.** In *Teleport,* the Ninth Circuit held that Section 158 rather than Section 1291 applies to appeals from district courts to courts of appeals in bankruptcy cases. However, the court did not distinguish between appeals from district courts' bankruptcy appellate decision and appeals from district courts' bankruptcy trial decisions. Instead, it simply referred to "bankruptcy matters." *Teleport,* 759 F.2d at 1378. The Ninth Circuit itself later rejected a broad reading of *Teleport* in *Benny,* 791 F.2d at 718 ("[b]y its literal terms, therefore, section 158 vests this court with jurisdiction over district courts' decisions *only* if those decisions are rendered on *appeal* from bankruptcy courts").

**14.** The Eleventh Circuit in *Regency Woods* held that Section 158 rather than Section 1292 governs *interlocutory* appeals from district court acting as a bankruptcy appellate court. The case now before us involves an appeal from a final order issued by a district court acting as a bankruptcy trial court. *Regency Woods,* 686 F.2d at 901. *Regency Woods* shows that courts turn to Title 28 of the U.S.Code, not Title 11, to resolve jurisdictional questions over appeals from district courts.

**15.** We also may not be able to review proposed findings of fact and conclusions of law given to district courts by bankruptcy courts under Section 157(c)(1). *See Teton Exploration,* 818 F.2d at 1524, n. 2 (rejecting *Teleport* for this reason); *Salem,* 783 F.2d at 632, n. 15.

River Production. River Production had access to all of these materials. Therefore, we find, as a matter of law, that the Trustee's motion and attached exhibits and the bankruptcy court's order constitute the contract between River Production and the Trustee.

### Termination of the Contract

■ Interpreting the language of the contract is a question of law. *Browning v. Navarro*, 743 F.2d 1069 (5th Cir.1984). Even in bankruptcy proceedings, courts of appeals look to state law to decide contract issues. *Shaw v. Dawson*, 48 B.R. 857 (D.C. N.M.1985).

We agree with the district judge that River Production could terminate the contract only if the parties failed to close within eleven days after the bankruptcy judge entered the order approving the sale. We also agree with the district judge that the sale did not close on time. However, we part company with the district judge after this point. Unlike the district judge, we do not find that River Production timely terminated the contract.

■ River Production did not tender its termination until July 27, 1987, exactly two months after the bankruptcy court entered its order approving the sale. Because River Production waited two months after the bankruptcy court entered its order before it attempted to rescind the contract, River Production waived the right to do so. *See Cotten v. Deasey*, 766 S.W.2d 874 (Tex. App.–Dallas 1989) (even if the contract specifies an exact date, the parties can waive it). In the alternative, we find that the parties extended the time to perform the contract from eleven days after the bankruptcy court entered its order to eleven days after the order was finalized. *See Id.; Hage v. Westgate Square Commercial*, 598 S.W.2d 709 (Tex.Civ.App.1980) (even when time is of the essence by express stipulation, parties may extend stipulated time limit by waiving strict compliance). The Trustee was prepared to close at the later date.

River Production's own termination letter bolsters our conclusion. Rather than citing the provision to close within eleven days after the bankruptcy court entered its order, River Production cited the clause allowing B/C to terminate the contract if the sale did not close by March 30, 1987. Only later did River Production argue that it terminated the sale because the sale did not close within eleven days after the bankruptcy court entered its order.

### Mutual Mistake

■ Under Texas law, mutual mistake occurs when both parties to a transaction believe in the present existence of the thing contracted for, that thing is material to the transaction, and that thing does not exist. *Horner v. Bourland*, 724 F.2d 1142, 1145 (5th Cir.1984).

■ In this case, the district court found that the Trustee mistakenly listed certain assets in the schedules attached to his motion, that River Production relied on those schedules, and that as a result, both the Trustee and River Production mistakenly believed that the sale conveyed more property than it in fact did. Accordingly, the district court held that the River Production could rescind the contract on the ground of mutual mistake.

We do not dispute the district court's finding that the leases listed on the exhibits attached to the motion were material to the transaction. Nor do we doubt that some of those leases expired by April 16th. However, we disagree with the district court's finding that both parties believed that every lease listed in the exhibit had not expired.

Based on our review of the record, we find that both the Trustee and River Production recognized that many of the leases listed on the exhibits attached to the Trustee's motion had expired and hence could not be assigned to River Production. Both parties acknowledged uncertainty over what the Trustee would convey to River Production. In fact, the transaction assumed that lack of knowledge. River Production cannot both pay a lower price due to uncertainty over the assets transferred and set aside the sale for that same reason.

While the Trustee could have more clearly indicated in the schedules that Topco may or may not possess interest in the oil and gas wells listed, the Trustee clearly stated elsewhere in the motion itself and in the Letter Agreement that he intended to assume and assign only those unexpired leases in which Topco had an interest to convey. River Production read the motion and the Letter Agreement, and therefore knew or should have known the precarious status of Topco's interest in the wells listed. In addition, the record repeatedly shows that River Production expressly acknowledged that it did not know exactly what it was purchasing. Therefore, we find no mutual mistake.

### Misrepresentation or Fraud

■ In order to rescind the contract for misrepresentation or fraud, River Production must prove that the Trustee intentionally misrepresented a material fact, River Production reasonably relied on that representation, and the reliance injured River Production. *See Citizens Standard Life Ins. Co. v. Muncy*, 518 S.W.2d 391, 394 (Tex.Civ.App.1974). If River Production established these elements at trial, River Production may void the contract. *Id.*

■ *Intentional misrepresentation.* The district court found that the Trustee intentionally misrepresented the material fact that many of the leases listed on the schedules attached to the motion had expired. The district court based this conclusion on its finding that the Trustee had access to monthly operating reports, the Trustee's agents knew about defaults in the leases, and the agents' knowledge should be imputed to the Trustee. In addition, the district court found that even if the Trustee did not know about the defaults, he should have known, and therefore would be responsible for any misrepresentations.[16]

■ We agree with the district court that paragraph 5 of the Trustee's motion, if read alone, misleads prospective purchasers by intimating that Topco holds more property interests than it may have held. We do not want to criticize the Trustee's language too harshly, however. The Trustee did not offer this motion to solicit offers from prospective purchasers. Instead, believing that Section 365(c) applied to these property interests,[17] the Trustee submitted

---

16. When persons, such as trustees, perform duties in the administration of bankrupt estates, they act as officers of the court, not as private persons. As such, trustees are held to high fiduciary standards of conduct. *In re Evangeline Refining Co.*, 890 F.2d 1312 (5th Cir.1989).

17. Perhaps the greatest irony of this case is the fact that the Trustee did not need the bankruptcy court's permission to assume and assign Topco's oil and gas "leases." Section 363 generally authorizes trustees to sell, lease, or use property of the estate in the ordinary course of business without notice or hearing. *Pride Exploration v. Marshall Exploration*, 798 F.2d 864, 866 n. 2 (5th Cir.1986) (trustee may transfer interest in oil and gas leases under Section 363(c)(1)). The Trustee mistakenly believed that he needed court approval to assume and assign these leases because they constitute unexpired nonresidential property leases covered by Section 365. Under that section, the trustee must move for permission to assume the lease, the bankruptcy court must conduct a hearing to determine any issues concerning adequacy of assurance of future performance, compensation for loss, and cure. If the bankruptcy court determines that assuming the lease will help the estate and the other parties involved in the lease are adequately protected, the court will grant the required

approval. *See In re By–Rite Distributing*, 47 B.R. 660 (Bankr.D.Utah 1985), *reversed by* 55 B.R. 740 (D.C.Utah 1985) (court need not approve assumption or rejection within sixty day period, assumes court approval necessary).

While we interpret the Bankruptcy Code as a matter of federal law, state law determines whether these contracts constitute unexpired leases subject to Section 365. *In re Harris Pine Mills*, 862 F.2d 217 (9th Cir.1988); *In re Petroleum Products*, 72 B.R. 739 (Bankr.D.Kan.1987). In Texas, they do not. Instead, they convey interests in real property; *Good Hope Refineries v. Benavides*, 602 F.2d 998 (1st Cir.1979) (interpreting Texas law). *Rogers v. Ricane Enterprises*, 772 S.W.2d 76, 80 (Tex.1989). The term "oil and gas lease" is a misnomer because the interest created by an oil and gas lease is not the same as an interest created by a lease governed by landlord and tenant law. *Cherokee Water Co. v. Forderhause*, 741 S.W.2d 377 (Tex.1987). As the district court noted, the so-called leaseholds at issue in this case actually constitute determinable fee interests. *See Howell v. Union Producing Co.*, 392 F.2d 95 (5th Cir.1968); *Amber Oil and Gas Co. v. Bratton*, 711 S.W.2d 741 (Tex.App.–Austin 1986); *Texas Commerce Bank Nat. Ass'n v. Interpol '80 Ltd. Partnership*, 703 S.W.2d 765 (Tex.App. 13 Dist.1985).

this motion to the bankruptcy court in order for the court to approve a sale ready to close pending court approval. To obtain court approval, the Trustee listed every leasehold in which Topco possibly had interest. Had he been more exacting and not listed questionable leases, the Trustee would not have the right to assign those interests to the purchaser, because he would lack court approval for the properties not listed. The Trustee also attempted to comply with Section 365(c) by alleging that no defaults existed in the leases and that B/C could perform the Trustee's obligations under the lease.

However, the Trustee did not act as carefully as he could have. He could have requested authorization to transfer all leases listed in the attached exhibit that had not yet expired. He also could have alleged that no defaults existed in those leases that had not yet expired. The Trustee also could have inserted in the final document memorializing the sale a provision that River Production did not rely on anything in the Trustee's motion or attached exhibits, but instead relied on its own inspection of the properties to be conveyed. Nevertheless, the Trustee's failure to take these steps does not amount to intentional misrepresentation.

Our conclusion accords with the purpose of Section 365. On the one hand, Congress

---

Other states also construe oil and gas "leases" this way. In Oklahoma, such leases are base or qualified fees. *Shields v. Moffitt,* 683 P.2d 530 (Okla.1984). They constitute present grants of oil and gas to be captured in the lands and resemble a *profit a prendre. In re Heston Oil Co.,* 69 B.R. 34, 36 (N.D.Okla.1986); *Hinds v. Phillips Petroleum Co.,* 591 P.2d 697 (Okla.1979). In Louisiana, a mineral lease is a real right, an incorporeal immovable. *Delta Energy Resources v. Damson Oil Corp.,* 72 B.R. 7, 11 (W.D. La.1985). *Cf. In re Myklebust,* 26 B.R. 582 (Bankr.W.D.Wis.1983) (mineral lease is an unexpired possessory lease); *In re J.H. Land & Cattle Co.,* 8 B.R. 237 (Bankr.W.D.Okla.1981) (under Kansas law oil and gas leases are intangible personal property).

We have not decided whether "oil and gas leases" constitute "leases" for the purpose of the Bankruptcy Code when they are not leases under state law. Under the Bankruptcy Code, leases of real property include any rental agreement to use real property. Section 365(m). Not all uses of real property constitute a lease under this definition. *Harris,* 862 F.2d 217; *In re Hanson Oil Co.,* 97 B.R. 468 (Bankr.S.D.Ill. 1989).

To determine whether Section 365 governs the oil and gas leases in this case we must determine what interest the leases create. *Hanson,* 97 B.R. 468; *Petroleum Products,* 72 B.R. 739; *Myklebust,* 26 B.R. 582. *Cf. In re Gasoil,* 59 B.R. 804 (Bankr.N.D.Ohio 1986).

The district court found that the so-called leases in this case actually constitute determinable fee interests under Texas law but did not decide whether the Trustee had to request the court's permission before assuming and assigning the "leases." Such determinable fee interests constitute freehold rather than leasehold estates. Freeholds differ substantively from leaseholds. As a result, we cannot consider these oil and gas "leases" to be leasehold interests just because of the terminology used. *Hanson,* 97 B.R. 468.

These leases do not grant title to the oil and gas itself, but grant the right to enter the land and reduce the oil and gas to the lessee's possession. *See Hanson,* 97 B.R. 468 (interpreting Illinois law); *Hinds,* 591 P.2d at 699 (interpreting Oklahoma law). This grant in effect constitutes a sale of part of the land. *Hanson,* 97 B.R. 468. Therefore, under Texas law, Section 365 does not govern their disposition. Instead of seeking the court's permission, the Trustee could have assumed the lease so long as he validly exercised his business judgment in the matter. *Richmond Leasing,* 762 F.2d at 1309.

Most courts considering the issue have adopted this approach. Several have concluded that oil and gas leases considered to be freehold estates by the governing state law do not constitute "unexpired leases" under the Bankruptcy Code and therefore Section 365 does not govern their assumption or rejection. In Oklahoma, oil and gas leases are not unexpired leases of real property subject to assumption or rejection. *In re Clark Resources,* 68 B.R. 358 (Bankr.N.D. Okla.1986), (declining to follow *In re J.H. Land,* 8 B.R. 237 (Bkrtcy.W.D.Okla.1981). *See, e.g., Hanson,* 97 B.R. 468 (oil and gas lease a freehold estate under Illinois law); *Heston,* 69 B.R. 34 (interpreting Oklahoma law); *Delta Energy Resources,* 72 B.R. at 11 (under Louisiana law mineral leases is an incorporeal immovable, not the conventional lease governed by Section 365).

However, in states where oil and gas leases constitute leasehold interests rather than freehold interests, Section 365 does govern their disposition. *See, e.g., Gasoil,* 59 B.R. 804 (interpreting Ohio law); *In re P.I.N.E.,* 52 B.R. 463 (Bankr.W.D.Mich.1985); *In re Integrated Petroleum Co.,* 44 B.R. 210 (Bankr.N.D.Ohio 1984); *J.H. Land,* 8 B.R. 237 (not governed by Section 365); *Myklebust,* 26 B.R. 582 (under Wisconsin law a mineral lease is an unexpired lease).

designed Section 365 to relieve debtors from obligations. *See In re Holland Enterprises,* 25 B.R. 301 (D.C.N.C.1982); *In re LHD Realty Corp.,* 20 B.R. 717 (Bankr. S.D.Ind.1982), *decided by* 726 F.2d 327 (7th Cir.1984). On the other hand, Congress designed Section 365 to give debtors means to force others to continue to do business with them when bankruptcy filing might discourage them from doing so. *Richmond Leasing,* 762 F.2d 1303. In effect, Section 365 allows debtors to pick and choose among their agreements and assume those that benefit their estates and reject those that do not. *In re G–N Partners,* 48 B.R. 462 (Bankr.D.Minn.1985). Congress did not design Section 365 to ensure that purchasers buy wisely or to protect their interests if they do not.

In this case, the Trustee used this provision to bring money into the bankrupt estate by selling Topco's interests in oil and gas wells. River Production now points to these various representations, made not to solicit offers for the property, but to obtain approval for a transaction ready to close, as grounds for rescinding the sale. We disagree with River Production's argument that the Trustee intentionally misrepresented the status of these assets. Nevertheless, we need not question any of these factual findings by the district court because we find that River Production did not reasonably rely on the Trustee's representations, if made.

■ *Reasonable reliance.* We do not question the district court's factual finding that River Production relied on representations made by the debtor during a two year period before the sale of the assets by the Trustee. We do question but need not decide whether River Production relied on the motion and the exhibits attached to the motion. However, we find that River Production could not *reasonably* rely on the representations made by the debtor, certain language in the motion, or the correctness of the property schedules attached to the motion, given the language in the Letter Agreement and the motion itself. Even if River Production could reasonably rely on the debtor's representations, certain language in the motion, or the correctness of the attached property schedules, it could not do so reasonably during the interval after it bid on the properties and before the bankruptcy court entered its order approving the sale.

River Production could not reasonably rely on the representations made by the debtor several years before the sale because River Production knew that the leases contained automatic expiration provisions if production ceased for more than sixty days. After River Production inspected those wells, Topco could have stopped production on wells due to lack of funds, thus triggering the sixty day clause. If Topco did not restart production during that sixty day period, Topco's interest in those wells automatically terminated. Any purchase would not include those wells on which production had ceased even though River Production saw those wells producing previously.

Even if River Production initially could reasonably rely on the debtor's representations, it could not do so after reviewing the Trustee's motion and attached exhibits, hearing testimony during the three days of hearings on the Trustee's motion, and examining appraisals submitted by the Trustee during the hearings. The motion and the Letter Agreement both clearly state that the Trustee intended to sell to B/C only whatever interests Topco held in the listed assets. Several witnesses at the hearing on the Trustee's motion testified that the properties were worth less than River Production bid and that many royalty owners were unhappy with Topco's performance. This testimony put River Production on notice that problems existed with some of the leases.

Even if River Production could reasonably rely on certain language in the motion and the Trustee's representations in the property schedules, it could not reasonably continue to rely on those schedules after it placed its bid and before the bankruptcy court issued its order approving the sale. During that period, a reasonable purchaser would inspect the properties purportedly included in the sale. If it had inspected the

properties, River Production would have discovered that the Trustee misrepresented the status of the leases (if, in fact the Trustee did) and reported that fact to the bankruptcy court before it entered its order. If it had done so, the bankruptcy court, being a court of equity, may have rescinded the sale. River Production then had another week to investigate before the bankruptcy court entered the order. Apparently River Production did not investigate the properties or if it did investigate and discover misrepresentations, it did not notify the bankruptcy court. In either case, we find that River Production's continued reliance on the debtors and the Trustee's purported misrepresentations to be unreasonable given the circumstances.

*Damages.* Because we find that River Production could not reasonably rely on the debtor's representations and the property schedules, we need not reach the question of damages. However, we could not determine damages on the basis of the record before us. Testimony in the record supports a finding that the leases have *increased* in value because of rising gas prices. Because the record does not establish the value of the leases at the time of the sale, we could not determine what damage, if any, River Production purportedly sustained as a result of the Trustee's actions.

■ *Waiver.* Even if the Trustee's actions amount to misrepresentation or fraud, River Production waived its right to rely on the Trustee's representations. Paragraph 10 in the motion states that B/C (now River Production) agreed to waive any reliance upon information provided by the Trustee, his operator, or his attorneys regarding the assets to be sold. In addition, in the Letter Agreement itself, B/C agreed to purchase Topco's interests "to the extent" they existed. Finally, River Production itself acknowledged several times during the bankruptcy proceedings that it waived any reliance on any information provided.

### Failure of Consideration

■ Failure of consideration occurs when, because of some supervening cause

[32]

after an agreement is reached, the promised performance fails. *Stewart v. U.S. Leasing Corp.*, 702 S.W.2d 288 (Tex.App. 1 Dist.1985). Total failure of consideration constitutes a ground for rescission. *Food Machinery Corp. v. Moon*, 165 S.W.2d 773 (Tex.Civ.App.1942). Partial failure of consideration does not invalidate the contract but instead is a defense *pro tanto. Huff v. Speer*, 554 S.W.2d 259 (Tex.Civ.App. 1 Dist. 1977).

■ The district court found "wholesale" failure of consideration because many of the oil and gas interests the Trustee purported to convey did not exist. However, the district court also found that the Trustee intended to convey some property to River Production. As a matter of law, that property constitutes partial consideration. Therefore, even though the district court called the Trustee's failure of consideration "wholesale," the district court actually found partial failure of consideration. However, the Trustee attempted to convey no less than he promised—whatever interest Topco held in the properties listed. Therefore we find no failure of consideration.

Nor are we so sure that River Production purchased as little as it alleges. Testimony before the district court indicates that even though these leases contain automatic termination provisions, royalty owners who have not signed new leases will agree to reactivate the leases if the producer agrees to restart production. The Bankruptcy Code does not prohibit the Trustee from reactivating these leases. *See In re Ted Liu's Szechuan Garden*, 55 B.R. 8 (Bankr. D.Dist.Col.1985).

### Conclusion

In summary, we find that this court has jurisdiction over the Trustee's appeal under Section 1291. We also find that River Production waived its right to terminate the contract and its right to rely on representations made by the debtor or the Trustee. Finally, we find no mutual mistake, no fraud or misrepresentation on behalf of the Trustee, and no failure of consideration.

And so, at last, we end our odyssey and REVERSE.