FOURNET, Chief Justice.
 

 This suit for a declaratory judgment, as authorized in certain instances by R.S. 13:4231 et seq.,
 
 [1]
 
 arose because of conflicting claims of ownership to leasehold rights, in a certain tract of land comprising approximately 298.19 acres in Catahoula.
 
 *497
 
 Parish belonging to plaintiff, Mrs. Stella Calhoun, and asserted on the one'hand by Mrs. Calhoun and the remaining plaintiffs, R. A. Campbell and Dorris Ballew,' Inc., as Mrs. Calhoun’s lessee under an oil, gas and mineral lease, and on the other .hand-by defendants Gulf Refining Company, and H. L. Hunt, the owners by mesne assignments of an oil, gas and mineral lease originally granted by a former owner of the same land. The opposing claimants sought to have the court declare their lease to be in full force and effect, construe it to cover the entirety of the mineral rights in the described lands, and declare the other lease to be null, void and of no legal effect. From the lower court’s judgment declaring both leases to be in effect to the extent of a fraction of the undivided interest in the mineral rights, construing the lease granted by Mrs. Calhoun to cover an undivided three-fourths of the mineral rights in the land therein described and the lease granted by the former owner to cover the remaining undivided fourth— this being, incidentally, in accordance with an alternative prayer of plaintiffs’ petition — the three plaintiffs and the above-named defe
 
 ndants
 

 [2]
 

 have appealed in so far as the judgment was adverse to them.
 

 Following disposition by the trial judge of various exceptions and motions (which are no longer at issue) the case was submitted on a general stipulation - of • facts, documentary exhibits, and testimony taken by deposition; from those sources the following undisputed facts are shown-: The above-mentioned 298-acre tract in Catahoula Parish was, for some 'time prior to October 7, 1943, owned -by Mrs. Mary C. Thigpen, a widow, and was unencumbered by a mineral servitude; on that date she conveyed the property to W. C. Thompson, reserving unto herself an undivided three-fourths of the oil, gas and other minerals.
 
 [3]
 
 Thereafter, on February 8, 1946, Thompson executed in favor of Joe F. Belt an oil, gas and mineral lease (hereinafter referred to as the Thompson lease) for a given consideration and a primary term of ten years, providing the usual 14th royalty and stipulating for payment of annual delay rentals in lieu of drilling in the sum of “One and no/100 per acre of minerals * * * Dollars ($1.00)”. While the lease on its face showed no limitation to the one-fourth mineral interest acquired by Thompson with the land, the parties nevertheless indicated the existence of outstanding mineral interests by the ad
 
 *499
 
 dition of a paragraph to the printed form (“Bath’s Form Louisiana Spec. 148”) incorporating the additional stipulation between the parties that “Lessor agrees that any additional or greater mineral interest in the leased premises that may be acquired by him by purchase or otherwise, is also included and leased herein, and upon his written notice to said lessee with evidence of such additional interest given thirty (30) days prior to any annual delay rental paying date, the delay rentals payable hereunder shall be increased proportionately.” This was followed by the additional statement that “All conditions between the parties hereunto shall extend to their heirs, executors, administrators, successors or assigns.” By mesne assignments, this lease, which had been duly recorded, was acquired by Gulf Refining Company on March 28, 1952; on May 8, 1952, Gulf transferred an undivided half interest therein to defendant H. L. Hunt.
 

 Meanwhile, by instrument dated November 30, 1949, Thompson had conveyed the property, together with an undivided one-fourth interest in the minerals, to plaintiff Mrs. Stella Calhoun;
 
 [4]
 
 in December of that year she conveyed it and a one-eighth mineral interest to Grey R. Brown, and reacquired it from Brown with all mineral rights on October 1, 1951. None of these three instruments contained mention of the Thompson lease.
 

 No well was drilled by the lessee or his assigns under the Thompson lease, but delay rentals in amount, of $74.55
 
 [5]
 
 were paid prior to the anniversary date of the lease (February 8th) each year for the first six anniversaries, i. e., through February 8, 1952 (this being just prior to the time the lease was assigned to Gulf Refining Company), by deposit of the funds to the credit of the lessor in the depository named in the lease, the Catahoula Bank at Jones-ville, Louisiana; and were received by the respective landowners, including Mrs. Calhoun. Prior to the next anniversary date Gulf Refining Company, having acquired the lease on March 28, 1952, deposited with the depository bank for the credit of Mrs. Calhoun the amount of $74.55, at the same time mailing to her a notice of payment identified with the lease. On her instructions, the Bank issued to Mrs. Calhoun its Cashier’s check in like amount; dated February 7, 1953, it showed “Payment of rental for the period beginning Feb. 8, 1953 — paid by Gulf Refining Co.” That check was retained but not cashed.
 

 
 *501
 
 At some time between April, 1953, and January, 1954, agents of Gulf Refining Company presented to Mrs. Calhoun and to her husband, for their signatures, a document purporting to amend and ratify the lease originally granted by Thompson to Joe F. Belt, with particular reference to the provision quoted in the second para-' graph of this opinion, “so as to more clear-, ly and definitely set forth the purposes and-intent of the above-quoted provision of said lease,” but the Calhouns did not ex-; ecute the document.
 
 [6]
 
 On October 7, 1953, there having been no user of the mineral reservation made by Mrs. Mary C. Thigpen, that servitude expired by the prescript tion of ten years liberandi causa. More than two weeks before the next anniversary date of February 8, 1954, Gulf Refining Company issued and delivered its check to the depository in amount of $375.53, and mailed a notice of payment to Mrs. Calhoun.’
 
 [7]
 
 The Bank, after deducting a charge for exchange, deposited the sum of $374.78 to Mrs. Calhoun’s credit, and on January 23, 1954, mailed to her a duplicate deposit slip.
 

 Mrs. Calhoun, on October 11, 1954, executed in favor of plaintiff R. A. Campbell a lease (hereinafter referred to as the Calhoun lease) covering the same acreage described in the Thompson lease, and five days later, on October 16, 1954, the depository bank received a letter signed by Mrs. Calhoun refusing the deposit made to her account the previous January 23rd and instructing the bank “forthwith to return same to the remitting parties.” This was
 
 *503
 
 followed, on-November 22, 1954, by formal-demand on defendants for cancellation of the Thompson lease, with motion of penalties and damages attendant upon failure to comply, as provided in R.S. 30:101 et seq. Campbell having entered into an agreement with plaintiff Dorris Ballew, Inc., for development of the Calhoun lease,- preparations were undertaken for the drilling of a well, and on the same day the well was spudded in (December 3, 1954) the defendants served notice of their claims upon Campbell. That well was completed as a producing well on December 16, 1954. Thereafter, and considerably in advance of the 1955 anniversary date of February 8th, defendants made tender in the usual manner of the delay rental, the amount being $298.19. A second, or off-set, well, drilled by Ballew, was completed as a producing well on April 10, 1955; and pursuant to the agreement between Campbell and Dorris Ballew, Inc., the former assigned to the latter an undivided one-fourth interest in and to the Calhoun lease in so far as it covers and affects the forty-acre unit around each of the producing wells. During this period, i. e., on March 12, 1955, and prior to the commencement of the second well, the instant suit was filed.
 

 The plaintiffs assign as error, the district court’s holding that the Thompson lease, was in force and effect to the extent
 
 oí
 
 the undivided one-fourth interest in the minerals, contending that there’was failure to properly pay or tender delay rentals for the years 1953, 1954 and 1955 in accordance with the terms of the lease contract; that tender of such rentals in an amount greater than that provided for by the lease is not a proper tender, especially where the amount tendered is calculated to enlarge the rights of the lessee to the detriment of the landowner.
 

 • The defendants, on the other hand, complain of the lower court’s ruling that when the servitude affecting a three-quarter mineral interest expired, that interest became vested in the then owner of the land completely unencumbered by the Thompson lease. Basing their argument on our jurisprudence declaring that a mineral lease is neither a sale nor a servitude, and therefore articles of the Civil Code applicable to leases must be employed in construing the rights and obligations created by, and the legal effects flowing from, mineral leases, and quoting Civil Code Articles 2682 and 2692
 
 [8]
 
 as authority for the proposition that ownership of the thing is not es
 
 *505
 
 sential to make a valid contract of • lease affecting the same, they quote Article 2015 of the Civil Code, under the title “Of Conventional Obligations,” with its declaration that leases form real obligations;
 
 [9]
 
 and contend that a vendee who takes real prop- - erty by transfer pending a recorded lease “stands in the shoes of the original lessor, is bound by each and every provision of the lease, and is liable [to comply with those provisions] by virtue of the ownership of the real property;” that since Mrs. Calhoun stands in the shoes of the original lessor, the doctrine of after-acquired title is applicable and the lease now covers the entire mineral interest.
 

 Defendants’ position is founded in part on the false premise that Thompson leased something belonging to another, and on the further fallacy — which is the basis of counsel’s whole argument — that under the provisions of Article 2015 of the Civil Code, Thompson’s obligation with respect to the acquisition of additional mineral interests in the property passed to his vendee, Mrs. Calhoun, and she stands in Thompson’s shoes. When Thompson and Belt executed the oil, gas and mineral lease for the exploration and development of the 298.19 acre tract, the ownership of the property had been dismembered to the extent of a three-fourths interest in the minerals, by virtue of the reservation made by Mrs. Thigpen when she sold the property to Thompson in 1943; the lease was therefore effective to the extent of only the one-fourth interest in the mineral rights which passed with the land upon Thompson’s purchase. Such rights as Belt or his assignees had under the special agreement contained in the added clause of the lease depended on Thompson’s acquiring any part or the whole of the outstanding mineral interest “by purchase or otherwise.” Thompson acquired no further interest. By the time the servitude became extinguished through non-use of ten years, Thompson no longer owned the land, and when the three-fourths .mineral interest represented by that servitude became vested in the then landowner, Mrs. Calhoun, she was under no obligation to carry out Thompson’s personal agreement or warranties.
 

 From the foregoing it is clear that Thompson did not lease property of which
 
 *507
 
 he was not the owner; but if it were to be conceded that such were the facts, a perusal of articles of the Code on the subject shows that our law does not countenance the proposition advanced by counsel that one may lease the property of another and bind the real owner without his consent— which consent must be in writing in cases involving immovables.
 

 This Court,, in dealing with the ordinary oil and gas lease, has applied the articles of the Code applicable to leases, these being found principally under the headings “Of Lease” and “Of Conventional Obligations.” The lessee under a lease contract does not obtain a real right in the sense of absolute dominion, and a lease is not one of those real obligations which attach as a burden to the land, as does a servitude; in other words, a lease is not a
 
 jus in re, but
 
 a
 
 jus ad rem,
 
 a right upon the thing.
 
 [10]
 
 Therefore, when Mrs. Calhoun acquired the land from Thompson, while the land was subject to the lease, that lease was limited to Thompson’s ownership in the minerals, that is, one-fourth, and the other three-fourths interest' remained outstanding. The clause in the Thompson lease dealing with the outstanding minerals merely evidenced a personal agreement between the original parties to the lease, was dependent on the happening of an uncertain event, and was limited to whatever additional ownership in the mineral rights Thompson might acquire while the lease was in full force and effect; the situation did not materialize; consequently, the clause fell when Thompson failed to acquire outstanding mineral interests, and those became vested in Mrs. Calhoun, the owner of the land, at the time the servitude was extinguished because of its non-use for a period of more than ten years.
 

 However, we are unable to agree with plaintiffs that the Thompson lease, in so far as it affects a one-quarter mineral interest, expired by its own provisions because the delay rentals were not properly paid for the years 1953, 1954 and 1955. The rental for 1953 presents no problem;
 
 [11]
 
 
 *509
 
 it was in an amount to correctly cover delay rental for a one-quarter mineral inter-, est, was Sent to the depository hank three days prior to the anniversary date of February 8th; and the fact that the Cashier’s check for the amount, issued on Mrs. Calhoun's instructions; has not been cashed and is still in her possession is unimportant here. Plaintiffs’ further contention that the sum deposited to Mrs. Calhoun’s account by the depository for the year 1954 was not payment according to the terms of the lease might merit greater consideration were it not for the fact that the deposit was made on January 22, and a duplicate deposit slip was sent to Mrs. Calhoun on January 23, two full weeks before the anniversary date; and while that amount was not withdrawn in whole or part, it was not until the following October, after the mineral lease to Campbell had been executed by Mrs. Calhoun, that she advised the bank the deposit for 1954 was refused, and requested that it be immediately returned to defendants. Had Mrs. Calhoun taken such action when the deposit was made, defendants might have immediately taken steps toward development or have made separate payment of the amount to maintain the lease to the extent of the one-quarter mineral interest it had always covered. Because of her silence and inaction, Mrs. Calhoun is now estopped to say that the sum was too large and therefore not a proper payment of delay rental. We conclude that the tender for the year 1954 preserved the Thompson lease as to the one-fourth mineral interest. That lease, to the extent of a fourth mineral interest, was continued in force and effect thereafter by production which began with the well drilled by Campbell in December of 1954.
 

 For the reasons assigned, the judgment appealed from is affirmed. The costs of the appeal are to be taxed against the plaintiffs and defendants in equal proportions.
 

 [1]
 

 . Pertinent here are the provisions of R.S. 13:4232: “Any person interested under a * * * written contract or other writings constituting a contract, or whose rights, * * * or other legal - relations are affected by a * * * contract * * *, may have determined any question of construction or validity arising under the instrument, * * * [or] contract, * * * and obtain a declaration of rights, * * * or other legal relations thereunder.”
 

 [2]
 

 . Others named as defendants, by supplemental petition, were record owners by mesne conveyances of mineral interests which, according to the judgment of the lower court, were extinguished by prescription liberandi causa on October .7, 1953. They did not appeal.
 

 [3]
 

 . Mrs. Thigpen subsequently sold to various purchasers the entire interest covered by the servitude created, by said mineral reservation.
 

 [4]
 

 . Mrs. Calhoun, who was married to and living with her husband, J. L. Calhoun, purchased with her separate funds which were under her separate management and control.
 

 [5]
 

 . The figure of $74.55 reflects one-fourth of the rental payable on the whole tract (which, for purposes of the lease, “shall be treated as comprising 29S.19 acres, whether there be more or less”) at $1.00 per acre.
 

 [6]
 

 . The suggested amendment to the quoted provision was that “Lessor agrees that, notwithstanding any provision herein to the contrary, this lease shall cover and apply to the lands above described ' and to all minerals and mineral rights therein and thereunder now owned and that may hereafter be acquired in any manner whatsoever by Lessor. And, Lessee agrees that as to such minerals and mineral rights as are hereafter so acquired by Lessor in said land Lessee ' will pay to Lessor on or before the 8th day of February, 1954, in the manner in which rentals may be paid under th'e'' terms of this lease, a sum of money equal to one hundred twenty-five three hundred sixty-fifths (125/365) of One Dollar. ($1.00) for each full mineral acre so acquired by Lessor provided that Lessor shall have delivered to Lessee on or ■ before the 8th day of January, 1954, evidence satisfactory to Lessee of such acquisition. Such rentals as Lessee may elect to pay on or before the 8th day of February, 1954, or on or before any subsequent rental payment date hereunder shall be paid in accordance with the other provisions of this lease.”
 

 [7]
 

 . The defendants, in their Answer and Demand in Reconvention, explain that, notwithstanding the failure of plaintiff to give notice of the acquisition by her of “any additional or greater mineral interest in the leased premises,” it had acted upon the assumption that she had acquired, by prescription, on October 7, 1953, the mineral interest previously reserved; and defendants had thus “increased proportionately” the delay rentals, being the rental of $298.19 plus an additional amount added as a precautionary measure, of $76.59, to cover (on a per diem basis) a rental on an undivided three-fourths oil, gas and mineral interest from October 7, 1953, to February 8, 1954.
 

 [8]
 

 . “He who lets out the property of another, warrants the enjoyment of it against the claim of the owner.” Article 2682.
 

 “The lessor is bound from the very nature of the contract, and without any clause to that effect: 1. To deliver the thing leased to the lessee. 2. To maintain the thing in a condition such as to serve for the use for which it is hired. 3. To cause the lessee to be in a peaceable possession
 
 of
 
 the thing during the continuance of the lease.” Article 2692.
 

 [9]
 

 . “Not only servitudes, but leases and all other rights, which the owner had imposed on his land before the alienation of the soil, form real obligations which accompany it in the hands of the person who acquires it, although he have made no stipulation on the subject, or they be not mentioned in the act of transfer. The purchaser may, if the circumstances permit it, have relief against the seller.for concealment of such charges; but the law establishes the rule that no one can transfer a greater right than he himself, has, except where the neglect of some formality required by law has subjected the owner of the real incumbrance to a loss of his right, in favor of a creditor or bona fide purchaser.” Article 2015.
 

 [10]
 

 . Bouv.Law Diet., Rawle’s Third Revision (1914), pp. 1787 and 1791. For an excellent dissertation on the subject, see Reagan v. Murphy, 235 La. 529, 105 So. 2d 210.
 

 [11]
 

 . Counsel, emphasizing that the proposition advanced on this point is by way of argument only, state that since the provisions of the lease required the delay rentals to be paid
 
 in advance,
 
 and since it was known by defendants that the Thigpen servitude would probably expire during the year 1953 unless they themselves decided to drill, “they should be required to pay an advance rental which would cover the one-fourtli mineral interest from 8 February 1953 to 7 October 1953 and the full mineral interest from 7 October 1953 until the payment of the next delay rental in 1954 or the termination of the lease that instead of doing so, defendants waited until the Thigpen servitude had prescribed, and then increased the tender on February 8, 1954, to cover a retroactive payment for the three-fourths mineral interest; that “These defendants had the information and control of the situation so as to
 
 *509
 
 determine the future life of the outstanding mineral servitude, and accordingly, they should be required to properly pay tbe delay rental in advance as required by tbe lease.”