**TEXACO INC., et al.**

v.

**LOUISIANA LAND AND EXPLORATION CO.,**
**et al.**

v.

**LaFOURCHE PARISH SCHOOL BOARD, et al.**

v.

**TEXACO, INC.**

**STATE OF LOUISIANA**

v.

**TEXACO, INC., et al.**

**Civ. A. No. 88–998–A.**
**Adv. No. 0164.**

United States District Court,
M.D. Louisiana.

Jan. 30, 1992.

See also 113 B.R. 924.

Gene W. Lafitte, Joe B. Norman, Catherine Brown, Liskow & Lewis, New Orleans, La., R. Gordon Kean, Jr., G. William Jarman, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, La., Frederick W. Veters, Robert E. Plumb, Wendy F. Daboval, New Orleans, La., Martin J. Bienenstock, Weil, Gotshal & Manges, Harvey R. Miller, New York City, for Texaco, Inc.

Charles D. Marshall, Jr., David Schell, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, La., for Louisiana Land & Exploration Co.

William J. Guste, Jr., Atty. Gen., State of La., Mary Ellen Leeper, Asst. Atty. Gen., Baton Rouge, La., for State of La.

Ernest R. Eldred, George L. Clauer, III, Eldred, Clauer & Davis, Baton Rouge, La., for State Mineral Bd.

Campbell C. Hutchinson, John Landis, Sarah S. Vance, Steven W. Usdin, Judith Barrasso, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for State Dept. of Natural Resources.

David Landry, Thibodaux, La., for La Fourche Parish School Bd.

Edward C. Abell, Jr., Robert K. Reeves, R. Thomas Jorden, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Mobil Exploration & Production Co. N.A., Inc.

John R. Martzell, Scott R. Bickford, Regina Matthews, Martzell, Thomas & Bickford, New Orleans, La., for William B. Lawton Co.

Mark B. Meyers, New Orleans, La., for Shell Offshore, Inc.

Allen L. Smith, Jr., Plauche, Smith & Nieset, Lake Charles, La., Robert Eikel, Houston, Tex., for amicus curiae, Dorothy Eikel Trust.

Lee H. Des Bordes, Jr., Baton Rouge, La., for amicus curiae, Joe & Dorothy Brown Foundation.

John M. McCollam, Gordon, Arata, McCollam & Duplantis, New Orleans, La., for amicus curiae, Chevron, USA Inc.

David R. Richardson, Chaffee, McCall, Phillips, Toler & Sarpy, New Orleans, La., for amicus curiae, Pennzoil Exploration and Production Co.

Jason A. T. Jumonville, Gordon, Arata, McCollam, New Orleans, La., for amicus curiae, Lainelife Assc. and Mrs. Linda Noe Laine and Gay Noe McLendon, Kristen McLendon & Dr. Anna Gray McLendon Mandel.

Alton E. Bayard, III, Edward B. Poitevent, II, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Baton Rouge, La., for amicus curiae, Unocal Exploration Corp.

Robert S. Rooth, David P. Richardson, Raymond G. Hoffman, Jose S. Canseco, Mary Beth Meyer, Chaffe, McCall, Phillips, Toler and Sarpy, New Orleans, La., for amicus curiae, Hunt Petroleum Corp., Hassie Hunt Exploration Co., Placid Oil Co. & Rosewood Resources, Inc.

## MEMORANDUM OPINION

JOHN V. PARKER, Chief Judge.

This matter comes to us by way of transfer from the United States Bankruptcy Court for the Southern District of New York.

### THE PARTIES AND PROCEDURAL HISTORY

Texaco, Inc. and two of its wholly owned subsidiaries instituted reorganization proceedings under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the Southern District of New York. The Chapter 11 proceedings were precipitated by a Texas state court judgment in the amount of some $10.5 billion rendered against Texaco and in favor of Pennzoil Company. Texaco, which claims to be one of the largest commercial corporations in the United States, was named as debtor in possession and it continued all of its worldwide business operations during the bankruptcy reorganization proceedings. Texaco asserts that the sole reason for the reorganization proceeding was the enormous judgment rendered in favor of Pennzoil and that, in every other respect, the company was solvent and actively engaged in its operations. A plan of reorganization was approved by the Bankruptcy Court under

the terms of which the Pennzoil judgment was satisfied by payment of $3 billion and the rights of all other creditors were left unimpaired.

Dating back to 1928, Texaco has acquired various interests in mineral leases upon lands and water bottoms owned by the State of Louisiana. Texaco filed a motion in the bankruptcy proceedings to assume certain listed mineral leases on State owned properties or alternatively, for a ruling that such mineral leases are not subject to Section 365 of the Bankruptcy Code (11 U.S.C. § 365). The State of Louisiana, through the Louisiana State Mineral Board and other state agencies, has objected to the assumption motion and has also filed a claim against Texaco.

Texaco filed a similar motion as to one or more mineral leases upon land owned by the Lafourche Parish School Board. The School Board also objected to assumption.

Prior to commencement of the Chapter 11 proceedings, the Louisiana Land and Exploration Company (LL & E) had filed suit against Texaco in a Louisiana state court alleging violations by Texaco of the provisions of an operating agreement between LL & E and Texaco relating to certain mineral leases on State lands. LL & E asserted that claim in the bankruptcy proceedings against Texaco. Those parties have advised the court that they have now settled their differences as to those claims.

The New York Bankruptcy Court, having concluded virtually all issues except the disputes over the Louisiana mineral leases, by approving the plan of reorganization, decided that resolution of these peculiar Louisiana issues was best left to a Louisiana court and thus transferred these issues to our Bankruptcy Court. Since Bankruptcy Judge Phillips disqualified himself, the undersigned has ordered the proceedings withdrawn from bankruptcy and is now presiding over them.

Some one hundred mineral leases on State owned lands and water bottoms are involved in this litigation. The State breaks them down into two groups: (1) The so-called "demand leases"—44 leases which were connected to a Louisiana industrial gas system operated by Texaco, and (2) all other State mineral leases in which Texaco claims to own any interest. As to the "demand leases," the State claims that Texaco has systematically and deliberately underpaid royalties due the State and the State has filed a claim seeking such an adjudication and seeking judgment for past due royalties, as well as judgment cancelling all 44 leases because of Texaco's alleged breaches of contract. The State has made no claim of any default by Texaco as to any of the 60 or so remaining leases.

The State has moved to certify a class of "persons having overriding royalty, working or other mineral rights in ... State ... mineral leases in which Texaco has or claimed an interest ..." against whom it may litigate its claims that termination of Texaco's mineral interests automatically terminates all of the outstanding interests in those leases. The State has added Mobil Exploration & Production North America, Inc. (Mobil) and William B. Lawton Company, Inc. (Lawton) as parties defendants, seeking to name them as class representatives under Rule 23, Fed.R.Civ.P. Mobil owns working interests in some State leases and Lawton is an overriding royalty owner in three leases.

The following motions are now considered by the court:

1. The motion by the State of Louisiana to certify a defendant class.

2. A motion by the State of Louisiana for partial summary judgment declaring that Louisiana mineral leases are subject to 11 U.S.C. § 365 and that under § 365(c)(1) those leases may not be assumed by Texaco.

3. A motion by the LaFourche Parish School Board for partial summary judgment virtually identical to the motion of the State of Louisiana relating to one or more mineral leases of School Board land to Texaco.

4. Motion on behalf of Texaco for partial summary judgment declaring that § 365 of the Bankruptcy Code poses no impediment to assumption by Texaco or,

alternatively, that the mineral leases are not subject to § 365.

5. A motion by LL & E for partial summary judgment dismissing counts one, two and twelve of the State's "amended & restated objections, amended & restated proof of claim and complaint" to the extent that the State seeks to use § 365(c)(1) to effect cancellation of leases or mineral interests.

6. A motion on behalf of Mobil for partial summary judgment declaring that § 365 of the Bankruptcy Code poses no impediment to assumption of State mineral leases.

7. Motion by the Lawton Company similar to those of the others.

Texaco, LL & E, Mobil and Lawton all oppose the State's motion for certification of a defendant class.

The court has received multiple briefs from all of the parties to the litigation as well as copious amicus briefs filed by many members of the proposed class and has heard extensive oral argument from all who wished to be heard.

## I.

### MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### BANKRUPTCY ISSUES

The issues involved in the motions for summary judgment require construction of Section 365 of the Bankruptcy Code. It is the position of the State, seconded by the LaFourche Parish School Board as to its leases with Texaco, that Louisiana mineral leases are "executory contracts" or "unexpired leases" within the meaning of Section 365. The State and the School Board further assert that Texaco, as debtor in possession, may not assume the leases because of the provisions of LSA–R.S. 30:128, which prohibit the "transfer or assignment" of any state lease unless approved by the State Mineral Board. The Mineral Board

has adopted a resolution which declares that it will never approve assumption of the leases by Texaco. The State argues that the provisions of Section 365(c)(1) prohibit the assumption and hence all outstanding interests in all the leases are automatically cancelled.[1] Texaco's position (along with some other parties and numerous amicus briefs) is to the contrary.

Section 365(a) provides that, with certain exceptions, "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Essentially all of the trustee's powers are vested in a debtor in possession by the provisions of 11 U.S.C. § 1107(a). Thus, we can conclude that § 365(a) authorizes a debtor in possession "subject to the court's approval, . . . (to) . . . assume or reject any executory contract or unexpired lease of the debtor."

Section 365(c) constitutes a qualification upon the broad powers granted by § 365(a). Section 365(c) provides that the debtor in possession:

> . . . may not assume or assign any executory contract or expired lease of the debtor . . . if—

> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, . . .; and

> (B) such party does not consent to such assumption or assignment . . .

The State claims that the state statute, LSA–R.S. 30:128, is "applicable law" which excuses it from accepting performance from an entity other than Texaco and because of the State's objection, that Texaco may not assume the mineral leases. The State further argues that, since Texaco may not assume the mineral leases, Texaco's interests, as well as all other outstanding interests in those leases, are automatically cancelled.

---

1. The School Board declares that under a similar statute, LSA–R.S. 30:156, the Board has like authority to frustrate assumption of its leases and it has adopted a similar resolution. Since their positions are identical, all discussion applicable to the State also applies to the School Board.

The statute provides, "No transfer or assignment in relation to any lease shall be valid unless approved by the State Mineral Board."

Bankruptcy Principles

It is well to note, at this juncture, some basic bankruptcy principles.

1. Although state law is frequently borrowed and applied, bankruptcy law is federal, not state, law. Article I, Section 8 of the Constitution grants the Congress the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States."

2. The major benefit to the debtor in a bankruptcy proceeding, whether liquidation under Chapter 7 or rehabilitation and reorganization under some other chapter such as Chapter 11, is a fresh start, obtained by discharge of his debts.

3. The fresh start granted to the debtor is not without cost to him. He essentially surrenders all of his assets for the benefit of his creditors, although there may be some property upon which he may claim an exemption. Section 541(a)(1) generally provides that the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."

4. As to creditors, the principle of equality of distribution applies, with some exceptions. See § 726.

5. All general (unsecured) prepetition creditors are paid pro rata, most of the time in what Professor Westbrook terms "little tiny Bankruptcy Dollars." See Westbrook, A Functional Analysis of Executory Contracts, 74 Minn.L.Rev. 227 (1989). "Their claims are calculated in full under state law, ... but their actual relief, the payment of the claims, can be thought of as being in little tiny Bankruptcy Dollars, which may be worth only ten cents in U.S. dollars." Id. at 253.

6. Unlike general or unsecured claims, administrative claims are given priority and are generally paid in full as expenses of the bankruptcy estate. See § 503.

7. The trustee in bankruptcy or debtor in possession, as representative of the estate, is charged with managing (administering, liquidating) the bankruptcy estate for the best interest of the general creditors or rehabilitation, which means maximizing the value of the bankruptcy estate and minimizing claims against it. See § 323; Westbrook, supra at 231–232.

8. In furtherance of that purpose, the trustee (debtor in possession) is granted "avoiding powers" that is, the power to set aside certain prepetition acts of the debtor. See §§ 544, 548 and 549.

9. The trustee (debtor in possession) is granted authority by § 365(a) to "assume or reject any executory contract or unexpired lease of the debtor," subject to approval by the court.

10. The authority of the debtor in possession to assume or reject prepetition contracts of the debtor should not be confused with the avoiding powers granted by other sections of the Bankruptcy Code.

11. The effect of assumption of a prepetition contract of a debtor is to obligate the bankruptcy estate to perform that contract, making it an administrative expense of the estate and thereby assuring that the claims of the other party to the contract will be paid in full. 2 Collier On Bankruptcy § 365.03 (15th ed. 1991).

12. Contrary to the position advanced by the State, the rejection of a prepetition contract of the debtor does not automatically cancel the contract. Under § 365(g), rejection constitutes a breach of the contract and thus grants the other party to the contract a claim against the bankruptcy estate as an unsecured creditor. 2 Collier On Bankruptcy § 365.08 (15th ed. 1991). This is explained by Professor Andrew:

'[R]ejection' is not some mystical power to cause contracts to vanish, nor a power to terminate, cancel or repudiate them. It is not even a 'power' to breach them in any meaningful sense (although it is, to be sure, a power that results in a deemed breach for claims allowance purposes). Rejection is very simple. It is the estate's decision not to assume—i.e., become administratively obligated on—a

contract, because the contract does not represent a favorable investment of the estate's resources. Andrew, Executory Contracts Revisited: A Reply to Professor Westbrook, 62 U.Colo.L.Rev. 1, 8 (1991).

13. Although rejection by a trustee or debtor in possession means that the debtor's obligations will not be performed by the estate, rejection does not amount to discharge of the debtor. Rejection creates a claim for breach of contract against the bankruptcy estate. See § 365(g). Only a discharge granted under Section 524 discharges the debtor from his obligations.

14. It follows from what has been said that any trustee (debtor in possession) will want to assume the prepetition contracts of the debtor which favor the estate and will want to reject prepetition contracts of the debtor that are unfavorable to the bankruptcy estate. From this comes the "business judgment" rule to the effect that the trustee (debtor in possession) will use his best business judgment for the benefit of the estate, subject to the approval of the court. See § 365(a).

The unusual nature of the Texaco Chapter 11 proceedings should not be overlooked. Texaco is a very large player in the oil and gas industry. There was no question of its solvency until the Texas state court judgment was rendered in favor of Pennzoil (ironically, Pennzoil has filed an amicus curiae brief supporting Texaco's position in this proceeding). The existence of that judgment caused Texaco to institute the Chapter 11 proceedings. Texaco was named debtor in possession and worked out a settlement of the Pennzoil judgment. Contrary to the usual Chapter 7 or even Chapter 11 bankruptcy proceeding, the Texaco plan of reorganization did not propose to pay the unsecured creditors with "little, tiny Bankruptcy Dollars." They were all (except Pennzoil) paid in full.

While the mineral leases involved in this litigation (some one hundred, as noted above) do not involve all of Texaco's mineral contracts, they do constitute an impor-

tant and favorable part of Texaco's operations. As the State observes in brief, the leases "cover over 330,000 acres of State owned lands and waterbottoms and include some of the largest producing fields in Louisiana." Memorandum in support of motion for summary judgment, p. 2. Obviously, if these mineral leases constitute "executory contracts or unexpired leases" under Section 365,[2] Texaco, as debtor in possession, wants to assume and perform them.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

In determining whether the Louisiana mineral lease is an "executory contract or unexpired lease" within the meaning of § 365, we must consider the nature of such a lease. Thus, we turn to Louisiana mineral law. As a civil law state, Louisiana's property laws are quite different conceptually from common law states. For example, Louisiana recognizes no separate "mineral estate."

1. Under Louisiana's Mineral Code, LSA–R.S. 31:1, et seq., a landowner may create the "basic mineral rights" of the mineral servitude, the mineral royalty and the mineral lease. All mineral rights are "real rights." LSA–R.S. 31:16.

2. The mineral lease is a contract "by which the lessee is granted the right to explore for and produce minerals." LSA–R.S. 31:114. Under Louisiana law, a mineral lease is an incorporeal immovable. LSA–R.S. 31:18. This is a concept which has no direct equivalent at common law.

3. A Louisiana mineral lease "is alienable and heritable." It may be mortgaged, sold, pledged or donated. LSA–R.S. 31:18.

4. The Mineral Code specifically provides that "the lessee's interest in a mineral lease may be assigned or subleased," LSA–R.S. 31:127, and that the lessor "must accept performance by an assignee or sublessee," LSA–R.S. 31:131.

5. The lessor's role under a Louisiana mineral lease is largely passive. He is

---

**2.** Texaco has continued in possession of the leases and has continued to operate the produc-

ing fields and to pay royalty throughout these proceedings.

"bound to deliver the premises that he has leased for use by the lessee," and "to refrain from disturbing the lessee's possession." LSA–R.S. 31:119.

6. The lessee under a Louisiana mineral lease has many obligations, including, "to develop and operate the property leased as a reasonably prudent operator for the mutual benefit of himself and his lessor" and to timely pay royalties, LSA–R.S. 31:122, 123.

The leases here involved constitute an important portion of Texaco's operations. While drilling and operation of wells require substantial expenditures, the return to Texaco on these leases is obviously greater than the cost to Texaco. Otherwise Texaco would not desire to assume and perform them.

The trustee (debtor in possession) would be remiss in his duty if he failed to request assumption of favorable mineral leases because they obviously add value to the bankruptcy estate and, in a Chapter 11 proceeding, facilitate reorganization.

UNEXPIRED LEASES

Texaco cites *Matter of Topco, Inc.*, 894 F.2d 727 (5th Cir.1990) in support of its argument that a Louisiana mineral lease is not an "unexpired lease" within the meaning of Section 365 of the Bankruptcy Code. In that case, Topco, an oil and gas producer, filed a Chapter 11 petition for reorganization. Subsequently, the Bankruptcy Court granted the motion of the trustee to convert the case from Chapter 11 to a Chapter 7 liquidation. The trustee solicited bids for Topco's oil and gas properties and eventually accepted a bid. Thereafter, the trustee moved the Bankruptcy Court for permission to assume the oil and gas leases and to assign them to the high bidder. The Bankruptcy Court approved the assumption and assignment. The assignment was not consummated because of appeals by the debtor and other delays and eventually the high bidder moved to rescind its agreement to purchase the properties. All of the mineral interests involved were created under Texas law. The high bidder and the debtor appealed to the district court which reversed the Bankruptcy Court and held

that the high bidder could rescind the contract with the trustee. The Court of Appeals reversed, holding that the high bidder could not rescind the contract, thus approving the trustee's assumption and assignment.

Texaco asserts that *Topco* stands for the proposition that a Louisiana mineral lease is not an ordinary lease such as those covered by Section 365.

In a lengthy footnote, the Court pointed out that under Texas law, mineral leases "convey interests in real property." Id. at 739, n. 17. The Court also included the dictum that, "In Louisiana, a mineral lease is a real right, an incorporeal immovable." Id. at 740.

Texaco reasons that, since a Louisiana mineral lease is a "real right," it is similar to a Texas mineral conveyance and hence cannot be an "unexpired lease."

Pretermitting the question of whether a Louisiana mineral lease may yet be an "executory contract," though not an "unexpired lease" (an issue not addressed by *Topco*), Texaco's reliance upon *Topco* is misplaced for several reasons.

First, the case involves Texas law, not Louisiana law. Second, all that is said in footnote 17, upon which Texaco relies, is dicta. The actual holding of the case is that the purchaser of the mineral interests from the trustee, who with the approval of the Bankruptcy Court, had assumed and assigned them, could not avoid the contract with the trustee.

Texaco could make a much stronger case if mineral servitudes, not leases, were involved. The Louisiana mineral servitude is another concept which has no direct equivalent at common law. Article 21 defines a mineral servitude as "the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership." Louisiana jurisprudence holds that:

An owner of a mineral servitude is an owner of an incorporeal immovable (La. R.S. 31:18), a real right. La.R.S. 31:16. "A mineral servitude is the right of en-

joyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership." La.R.S. 31:21. And it is a dismemberment of the title insofar as it creates a secondary right in the property separate from the principal right of ownership of the land.

Plaintiffs are quick to point out that we do not recognize (as does the common law) a separate estate in minerals. And they are certainly correct on this point.

. . . . .

That does not, however, change the fact that the creation of a mineral servitude effectively fragments the title such that different elements of ownership are held by different owners (i.e., between the landowner and the mineral servitude owner), ... Steele v. Denning, 456 So.2d 992, 998 (La.1984).

While both the mineral servitude and the mineral lease are "real rights," LSA–R.S. 31:16, 18, Louisiana jurisprudence defines significant differences between them. As the Supreme Court of Louisiana commented in Calhoun v. Gulf Refining Company, 235 La. 494, 104 So.2d 547 (1958).

This Court, in dealing with the ordinary oil and gas lease, has applied the articles of the Code applicable to leases, these being found principally under the headings "Of Lease" and "Of Conventional Obligations." The lessee under a lease contract does not obtain a real right in the sense of absolute dominion, and a lease is not one of those real obligations which attach as a burden to the land, as does a servitude; in other words, a lease is not a jus in re, but a jus ad rem, a right upon the thing.... Id. at 551.

In considering the effect of LSA–R.S. 9:1105, the predecessor statute to Articles 16 and 18 of the Mineral Code, the Court of Appeal in Succession of Simms, 175 So.2d 113 (La.App. 4th Cir.1965); affirmed, 250 La. 177, 195 So.2d 114 (1965); cert. denied 389 U.S. 850, 88 S.Ct. 47, 19 L.Ed.2d 120 (1967), commented:

After considering the innumerable ramifications of the problems involved in these arguments, it seems perfectly clear to us that "real rights" and incorporeal immovables are not separate and distinct concepts. While it is indeed unfortunate that Louisiana mineral law, which, to say the least, is already confused, should be further encumbered by common law terminology appearing in the statutes creating "real rights", we feel that this inadvertent use of semantics does not change the nature of the concept represented thereby. Consequently, we are of the opinion that the "real rights" created by the legislature merely constitute a species of incorporeal immovable property irrespective of what they are termed, and therefore must be accorded the same treatment by the courts. 175 So.2d at 125.

In affirming that decision, the Louisiana Supreme Court noted:

These statutes and the jurisprudence thereunder did not have the effect of overruling the above quoted codal provisions which place incorporeal things, consisting only of rights that are not "of themselves strictly susceptible of the quality of movables or immovables," such as leases, in one classification or the other, according to the object to which it applies. Thus a contract leasing a movable is, under the code, classified as a movable, whereas a contract leasing an immovable is classified as an immovable. In the latter case, the real property is, itself, liable for the obligation. It is for this reason that all contracts and donations affecting realty must be, as is required for the transfer of real property, in writing and recorded in the parish where the immovable to which they apply is situated to be legally effective. 195 So.2d at 128.

These Louisiana authorities make it plain that while the Louisiana mineral lease is more than an "ordinary" lease, it does not convey any mineral estates or indeed, any title to the land—what the common law courts call "determinable fee interests." Topco, supra at 739, n. 17. Louisiana mineral leases are, therefore, quite different from Texas "leaseholds." Thus, the hold-

ing of *Topco* does not prevent classification of the Louisiana mineral lease as an "unexpired lease," although it is not authority to the contrary either. This court need not resolve that issue because an unexpired lease is only one type of executory contract.

## IS THE LOUISIANA MINERAL LEASE AN "EXECUTORY CONTRACT?

■ Further contrast of the Louisiana mineral lease with the Louisiana mineral servitude may be instructive here. As noted earlier, the Louisiana mineral lessee has many obligations, LSA–R.S. 31:122, 123, while the landowner's (lessor's) obligation is basically only that of non-interference. Article 119. The owner of a mineral servitude, however, "is under no obligation to exercise it." LSA–R.S. 31:22. Although the servitude owner may himself explore or grant a mineral lease to another, he is under no compulsion to do so. The mineral servitude, however, is subject to liberative prescription and if no use of it is made for a period of ten years, it expires. LSA–R.S. 31:27.

As the Louisiana jurisprudence quoted above establishes, creation of the mineral servitude conveys a species of title ("effectively fragments the title," *Steele v. Denning, supra,* 456 So.2d at 998). The mineral servitude owner has no duty to perform—he owes no obligation to the landowner to explore and in many instances would have no obligation to pay royalty if he produced minerals. Such servitudes are typically created when a landowner sells the land but reserves all or a portion of the minerals. In at least some respects, one can say that after creation of the servitude, it becomes property rather than an executory (unperformed) contract. Not so with the Louisiana mineral leases.

The commentators have pointed out that no area of bankruptcy law has created such confusion and misapplication as the area of executory contracts.

Professor Countryman in a pair of articles, Executory Contracts In Bankruptcy: Part 1, 57 Minn.L.Rev. 439 (1973) and Part 2, 58 Minn.L.Rev. 479 (1974), suggested that an "executory contract" under Section

365 is one "under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." See Countryman, Part 1, at 460. He pointed out that his proposed definition was more narrow than Professor Williston's, "All contracts to a greater or less extent are executory. When they cease to be so, they cease to be contracts." 1 S.Williston, Contracts § 14 (3d ed. 1957), quoted in Countryman, 57 Minn.L.Rev. at 450. Professor Countryman's suggested definition was subsequently accepted and adopted by many courts and has been applied on many occasions.

Professors Andrew and Westbrook have now come along and argue for a return to Professor Williston's definition—that in effect, a contract is a contract and any prepetition contract of a debtor which is advantageous to the bankruptcy estate may be assumed by the trustee or debtor in possession and, if it is not advantageous to the bankruptcy estate, may be rejected by the trustee or debtor in possession, always subject to approval by the court. See Andrew, Executory Contracts in Bankruptcy: Understanding 'Rejection,' 59 U.Colo. L.Rev. 845 (1988); Westbrook, A Functional Analysis of Executory Contracts, 74 Minn.L.Rev. 227 (1989); Andrew, Executory Contracts Revisited; A Reply to Professor Westbrook, 62 U.Colo.L.Rev. 1 (1991). Properly understood within the intended operation of the bankruptcy system, Professors Andrew and Westbrook make strong cases. They suggest that ordinarily the prepetition contract of a debtor should be assumed by the bankruptcy estate when the cost of the performance of the bankrupt's obligations under the contract is exceeded by the benefits to be obtained from performance of the contract by the other party.

An argument can be made that a Louisiana mineral lease is an executory contract because the lessor throughout the performance of the contract owes the obligation of non-interference and the lessee owes the

significant obligations of development and paying royalty. Viewed in this light, there are bilateral obligations to be performed under the State leases.

In this court's view, however, Professor Countryman's notion that executory contracts require bilateral unperformed duties is too narrow when applied to contracts of this nature. In a Louisiana mineral lease, virtually all performance is by the lessee throughout the entire term of the contract. It is no less an unperformed (executory) contract because performance is due primarily by the lessee. An existing mineral lease is a contract which has not been fully performed, hence an "executory" contract. Once the contract has been fully performed (executed), it is no longer a contract. "A mineral lease terminates at the expiration of the agreed term or upon the occurrence of an express resolutory condition." LSA–R.S. 31:133. The mineral lease is not subject to liberative prescription but it must have a term which may not exceed ten years without drilling or production. LSA–R.S. 31:115.

Two Fifth Circuit cases, although not directly in point, lend support to the conclusion that the Louisiana mineral lease is an executory contract under Section 365. Both cases involved Chapter 7 bankruptcy proceedings by Louisiana lawyers who held contingency fee contracts with various clients. In *Matter of Tonry*, 724 F.2d 467 (5th Cir.1984), the Court held:

> The contingent fee contract comes within the ambit of § 365 of the Bankruptcy Code, 11 U.S.C. § 365, which governs executory contracts. The term "executory contract" is not defined in the code, but according to the legislative history, "it generally includes contracts on which performance remains due to some extent on both sides." ... (citations omitted) ... We recognized in *In re American Magnesium Company*, 488 F.2d 147, 152 (5th Cir.1974), a bankruptcy proceeding, "that a contract is executory when something remains to be done by one or more of the parties." We hold today that an attorney's contingent fee contract is executory if further legal services must be performed by the attor-

ney before the matter may be brought to a conclusion. Id at 468.

The Court re-affirmed this view in *Turner v. Avery*, 947 F.2d 772 (5th Cir.1991).

A lawyer's contingent fee contract is similar in "executoriness" to a Louisiana mineral lease. In both types of contracts, performance is imposed almost exclusively upon one party. The client, similar to the lessor, has only passive obligations, while the lawyer, similar to the mineral lessee, must perform many obligations. A contingent fee contract is certainly not an incorporeal immovable, as is a mineral lease, but during their existence both are unperformed, hence executory, contracts.

This interpretation is entirely consistent with bankruptcy principles. The trustee (debtor in possession), subject to approval of the court, ought to have the authority to assume (and perform or sell) mineral leases which enhance the bankruptcy estate to the benefit of the general creditors or which further rehabilitation of the debtor. Were Texaco in liquidation rather than rehabilitation, could anyone seriously propose that the fruits of valuable mineral leases, covering 330,000 acres and many of Louisiana's most productive fields, be denied to the general creditors?

Thus, this court concludes that the Louisiana mineral lease is an "executory contract" within the meaning of Section 365(a). That conclusion does not, however, resolve all the issues.

## THE ASSUMPTION PROBLEM

We now turn to the next issue—whether Texaco, as debtor-in-possession, is precluded from assuming the State mineral leases at issue under the exception provided in paragraph (c) of § 365, which provides in pertinent part:

> (c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from

or rendering performance to an entity other than the debtor or debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment ...

As noted above, the State objects to Texaco's proposed assumption of the State leases based on LSA–R.S. 30:128 which provides that "[n]o transfer or assignment in relation to any [State] lease shall be valid unless approved by the State Mineral Board." The State advocates the following "literal" interpretation of § 365(c)(1):

(c) The trustee [debtor-in-possession] may not assume or assign any executory contract or unexpired lease of the debtor [Texaco] ... if;

(1)(A) applicable law [La.R.S. 30:128] excuses a party [Louisiana], other than the debtor [Texaco], to such contract or lease from accepting performance from ... an entity other than the debtor [Texaco] or the debtor in possession [Texaco in possession] ...; and

(B) such party [Louisiana] does not consent to such assumption or assignment.

Thus, under the State's "literal" construction of § 365(c), Texaco may not assume the leases because LSA–R.S. 30:128 would render a theoretical assignment of the leases to a third party void absent approval of the State Mineral Board.

Defendants essentially argue that the "literal" construction advanced by the State is contrary to the "long-standing anti-forfeiture" policy behind the Bankruptcy Code and the twin goals of rehabilitation of the debtor and equitable treatment of creditors. Defendants contend that the "plain meaning" of § 365(c) is to preclude assumption or assignment of non-delegable duties and performance. Additionally, defendants dispute the contention that Section 128 is an "applicable law" which "excuses" the State from accepting performance under the leases by Texaco.

At oral argument, there was a general consensus that the phrase "transfer or assignment" as used in Section 128 does not encompass assumption of the leases by Texaco as debtor in possession. In *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Supreme Court squarely held that a debtor in possession is the same "entity" as the pre-petition debtor. Therefore, it is clear that the proposed assumption by the same entity (debtor in possession) under bankruptcy law would not constitute a "transfer or assignment" within the meaning of LSA–R.S. 30:128. While Section 128 applies to State leases in general and would apply in the event of assignment of the leases, it has no application to the facts at hand which involve only assumption by the debtor in possession—the same entity as the prepetition debtor.

While the State concedes that no assignment to a stranger is contemplated here, it argues that the fact that the statute is inapplicable under the circumstances of this case is immaterial. According to the State, § 128 would preclude a hypothetical transfer or assignment of the leases to a third party without its consent. Therefore, the State concludes that § 128 is an "applicable law" that "excuses" it from accepting performance from "an entity other than the ... debtor in possession [Texaco]," thereby barring assumption of the leases by Texaco under § 365(c).

The primary authority cited by the State is *Matter of West Electronics Inc.,* 852 F.2d 79 (3rd Cir.1988) which adopts a "hypothetical test" analysis in construing § 365. In *West,* the Third Circuit held that a debtor in possession could not assume a contract (to supply missile launcher power supply units to the Air Force) because 41 U.S.C. § 15 would require government approval of an assignment of the contract to someone other than the debtor in possession. The Third Circuit found that § 365(c)(1) creates "a hypothetical test—i.e., under the applicable law, could the government refuse performance from 'an entity other than ... the debtor in possession'." Id, at 83. According to the Third Circuit, the relevant inquiry was not whether 41 U.S.C. § 15 precluded "an assignment from West as debtor to West as debtor in possession, but whether it would foreclose

an assignment by West to another defense contractor." Id.

It appears that no other federal appellate court has considered this precise issue. The only Fifth Circuit case cited by the parties involving § 365(c) is *In re Braniff Airways, Inc.,* 700 F.2d 935 (5th Cir.1983), a case which did involve a proposed assignment of a contract to a third party.

In *Braniff,* the district court authorized Braniff to assume and assign its rights under a lease of airport terminal space at Washington National Airport to another airline. The authorization for *Braniff* to assume the lease was not appealed; however, the authorization of the assignment to the other airline was challenged on appeal. The Fifth Circuit opines [3] that § 365(c) is not limited to "personal service contracts" and that applicable law required FAA approval of any person operating at the airport. Consequently, the Fifth Circuit concludes that the district court erred in authorizing the assignment of the lease under 365(c).

While *Braniff* might be authoritative in cases involving assignments to third parties, it provides little guidance in the matter at hand because no such assignment is involved here. However, the parties have cited several lower court decisions that are more on point. While some of these decisions support the State's argument, the trend appears to be away from the "hypothetical test" of *West.* See e.g., *In re Fastrax, Inc.,* 129 B.R. 274 (M.D.Fla.1991); *In re Ontario Locomotive & Indus. Ry. Supplies (U.S.) Inc.,* 126 B.R. 146 (Bankr. W.D.N.Y.1991), *In re Cardinal Industries, Inc.,* 116 B.R. 964 (Bankr.S.D.Ohio 1990).

After reviewing the jurisprudence and the terms of the statute itself, this court is persuaded that the "hypothetical test" or "literal" interpretation analysis advanced by the State plaintiffs is incorrect for multiple reasons. In adopting the "hypothetical test," the Third Circuit states that Congress wanted § 365(c)(1) to:

"reflect its judgment that in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going though bankruptcy are materially distinct entities."

*West, supra,* at 83.

This "separate entity" reasoning is directly contrary to the Supreme Court's view expressed in *Bildisco, supra,* that the debtor in possession is the same entity as the prepetition debtor. Yet, the Third Circuit fails to even mention *Bildisco* in its ruling. Indeed, in a separate opinion in *West,* Judge Higginbotham disagrees with the "different entities" part of the panel's decision.

Moreover, this court is not convinced that Congress ever intended § 365(c) to bar an assumption of a contract by a debtor in possession simply because there is a statute that conditions transfers to third persons upon approval of the nondebtor party. As exhaustively discussed in *Cardinal Industries,* the analysis in *West* extends § 365(c) beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's enterprise.

■ Another area of disagreement with the rationale of the Third Circuit in *West* relates to whether § 365 should be applied to contracts other than non-delegable or personal service contracts. As noted above, the Fifth Circuit in *Braniff* has indicated that § 365 is not so limited. While that pronouncement may or may not be dictum [4], the court finds Judge Kahn's discussion of this issue in *Matter of Fulton Air Service, Inc.,* 34 B.R. 568 (Bankr. N.D.Ga.1983), to be very forceful. Accepting the Fifth Circuit's broad dictum, however, it is evident that the Congress intended § 365(c) to be a narrow exception to the general rule allowing assumption of executory contracts and unexpired leases.

---

**3.** This court views the third part of the *Braniff* opinion (which addresses the lower court's authority over the lease) to be dicta inasmuch as the Fifth Circuit admittedly did not have to reach the issue but did so on the premise that the issue was "likely to recur." Braniff, at 942.

**4.** See footnote 3 supra.

*Matter of Terrace Apartments, Ltd.*, 107 B.R. 382 (Bankr.N.D.Ga.1989).

It is additionally noteworthy that *West* and *Braniff* involve contracts of obvious public importance. The contract in *West* was one to supply missile launcher power supply units to the armed forces; the contract in *Braniff* was a lease of space at Washington National Airport. There are no overriding public policy interests at stake in the litigation at hand. See *Matter of Federated Dept. Stores, Inc.*, 122 B.R. 313 (Bankr.S.D.Ohio 1990).

While the State has repeatedly urged this court to apply § 365(c) literally, the phrase "applicable law" is commonly used to refer to the law applicable to the facts of the case at hand rather than some law that may be applicable to another set of circumstances. Clearly, LSA–R.S. 30:128 is not an applicable law in that sense. Consequently, the court disagrees with the State's major premise that a literal application or fair reading of § 365 prevents the proposed assumption of the leases at issue.

Ultimately, the State's argument stands bankruptcy law upon its head. The proposition tends to defeat the basic bankruptcy purpose of enhancement of the bankruptcy estate for benefit of rehabilitation and the general creditors upon a highly technical "hypothetical" test which furthers no bankruptcy purpose at all. It would allow one disgruntled creditor to frustrate payment of claims to other creditors or rehabilitation, contrary to the whole purpose of bankruptcy. This court will not accept such a construction.

For the forgoing reasons, the motions for partial summary judgment by the State and the School Board are hereby DENIED. The motions for partial summary judgment by all other parties are hereby GRANTED to the extent that the court holds that there is nothing in Section 365(c)(1) which prevents Texaco, as debtor in possession, from assuming all State mineral leases in which it has interests. Whether Texaco can meet all the assumption requirements is not now before the court and thus is left for another day.

## II.

### THE CLASS ACTION ISSUES

While there is authority for the proposition that a district court should consider class certification separately from the merits of a claim, the Fifth Circuit has held that a district court may always grant a motion for summary judgment or a motion to dismiss prior to acting upon class certification. In *Floyd v. Bowen*, 833 F.2d 529 (5th Cir.1987) the Court held:

> The timing requirements of Rule 23, however, are not absolute. Professor Wright explains that "[t]he court always is empowered to make a determination on the merits irrespective of the denomination of the suit as a class action ... the propriety of that inquiry is limited only by concerns of whether the class determination should be postponed until after the merits determination." C. Wright, A. Miller, and M. Cane, 7 Federal Practice & Procedure, 1785 at 128 (footnote omitted) (1986). Indeed, as Judge Wisdom indicated in *Miller [v. Mackey International, Inc.*, 452 F.2d 424, 427] [ (5th Cir.1971) ] the class action litigation may be halted by a Rule 12 motion to dismiss or by a Rule 56 motion for summary judgment. 452 F.2d at 429. See also, *Pharo v. Smith*, 621 F.2d 656, 664 (5th Cir.), modified on other grounds, 625 F.2d 1226 (5th Cir. en banc 1980); *Jacobs v. Gromatsky*, 494 F.2d 513, 514 (5th Cir.1974). This is the rule in several other circuits as well. See *Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir.1984), cert. denied, 471 U.S. 1125, 105 S.Ct. 2656, 86 L.Ed.2d 273 (1985); *Wright v. Schock*, 742 F.2d 541, 543–44 (9th Cir.1984); *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 719–20 (8th Cir.1978); *Crowley v. Montgomery Ward & Co.*, 570 F.2d 877, 879 (10th Cir.1978). But see, *Finberg v. Sullivan*, 634 F.2d 50, 64 (3rd Cir.1980) (en banc). We therefore conclude that the district court did not abuse its discretion in failing to rule on the class certification issue because it ruled for the Secretary on the merits of its summary judgment motion. *Id.* at 534.

Accordingly, this court holds that the State's motion to certify a class of defendants as to the Section 365 issue is MOOT and is hereby DENIED for that reason.

 The State also seeks to certify the same class of defendants on its claim that Texaco has underpaid royalties due under the so called "demand" leases. The State alleges that Texaco has "fraudulently" underpaid royalties due to it and that it is therefore entitled to demand dissolution of all 44 demand leases which the State claims will also automatically terminate all other outstanding interests in the leases.

Significantly, the State has not yet established that Texaco has actually underpaid any royalty on any lease. Second, dissolution of mineral leases is not favored under the Louisiana Mineral Code. Article 141 (LSA–R.S. 31:141) provides:

§ 141. **Dissolution not a favored remedy**

In a case where notice of failure to pay royalties is required, dissolution should be granted only if the conduct of the lessee, either in failing to pay originally or in failing to pay in response to the required notice, is such that the remedy of damages is inadequate to do justice.

 Thus, dissolution is not at all automatic for breach of a lease, even underpayment of royalty. Certification of a class is premature as to the "demand" lease issues. The State must first prove actual underpayment and then present evidence that would justify consideration of dissolution as a remedy. Only at that point will the court entertain a request for class certification relating to dissolution issues and issues as to the effect upon mineral interests other than Texaco's.

Accordingly, the court declines to certify any class at this time.